# United States Court of Appeals

## For the First Circuit

No. 11-2247

RICHARD G. CODY,

Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE SECURITIES AND EXCHANGE COMMISSION

Before

Boudin, Hawkins[*] and Thompson,

<u>Circuit Judges</u>.

Stephen Z. Frank with whom <u>Law Office of Stephen Z. Frank</u> was on brief for petitioner.
Daniel Staroselsky, Senior Counsel, Securities and Exchange Commission, with whom <u>Mark D. Cahn</u>, General Counsel, <u>Michael A. Conley</u>, Deputy General Counsel, <u>Jacob H. Stillman</u>, Solicitor, and <u>Randall W. Quinn</u>, Assistant General Counsel, were on brief for respondent.

September 7, 2012

---

[*]Of the Ninth Circuit, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  Richard G. Cody seeks review in this court of an administrative determination, sustained by the Securities and Exchange Commission ("SEC"), that Cody mismanaged various brokerage accounts under his supervision.  The original determination including sanctions was made by the Financial Industry Regulatory Authority ("FINRA").  A reasonably full description of the underlying events and evidence is required.

In 1996 Cody became a "registered representative" in the securities industry, that is, a person who has passed an examination administered by FINRA and obtained a license to solicit, purchase, and sell securities while working with a member firm of FINRA.  In practice, his clients often allow him to exercise de facto control over their accounts, whereby he consults the clients about general strategies but routinely executes specific trades on behalf of his clients without first asking for their authorization.

During his career he has worked for several different brokerage houses including Merrill Lynch and Salomon Smith Barney but between 2001 and 2005, he worked at Leerink Swann & Co. ("Leerink").  In 2003-2004, he made investments for two couples--Richard and Lenore DeSimone and James and Emma Bates--certain of which are the centerpiece of this case.  These four were near or in retirement, were not skilled investors, and expressed no interest in acquiring speculative investments for the accounts at issue.

-2-

The DeSimones told Cody they desired investments that would be relatively safe but that would provide steady income they needed to fund their retirement. Lenore DeSimone had held a 401(k) that carried mutual funds for about twenty years, and the DeSimones had also held savings accounts, savings bonds, and a small account previously managed by another broker. At issue are two of the DeSimones' several accounts: Lenore DeSimone's IRA and a joint account. For both the IRA and the joint account, the DeSimones listed an investment objective of "long-term growth."

The DeSimones asked Cody to pursue a strategy of investing in safe, highly-rated bonds with maturity dates of around ten years. They told Cody they were relying on his expertise to execute this strategy in a way that would protect their investments. On Cody's records, the IRA listed a risk tolerance of "moderate" while the joint account listed a risk tolerance of "speculation," but Lenore DeSimone testified that she believed that Cody filled out the risk tolerance entry, and Cody conceded that the DeSimones were not interested in speculation.

James and Emma Bates were friends of the DeSimones, who introduced them to Cody, and in February 2003, James Bates opened an IRA with Cody. James Bates' IRA initially contained assets of $380,046; James Bates hoped that the account would generate a monthly income of $2,000, which equated to an annual return of approximately 6.3 percent. In his account opening forms, James

Bates listed an investment objective of "income" and a risk tolerance of "low." Cody advised James Bates that he could achieve the desired income while maintaining low risk by investing in bonds.

In February 2003, Cody invested money from James Bates' IRA and the DeSimones' joint account in the Credit Suisse First Boston Mortgage Securities Corp. IndyMac Manufactured Housing Passthru (the "Credit Suisse Security"), a fixed-income security. Cody invested $86,500 from James Bates' IRA (23 percent of the total account) and $31,725 from the DeSimones' joint account (13 percent of the total account) in the security. The Credit Suisse Security was collateralized by installment sales contracts and installment loans for mobile homes.

The Credit Suisse Security was one of eleven "tranches" of securities collateralized by the same set of assets; its tranche was eighth out of the eleven in order of priority. This meant that the security was eighth in line to receive payments, and fourth out of the eleven to bear losses if the borrowers defaulted on their payments. The security carried a 7.105 percent coupon and had a stated maturity of February 2028, but the borrowers had the option of prepaying the underlying installment loans and contracts.

Cody invested his clients' funds in the Credit Suisse Security after it was recommended by a colleague at Leerink, Timothy Skelly, who specialized in fixed-income securities. Skelly

gave Cody basic information--_e.g._, the issuer, the coupon percentage, the date of maturity, the nature of the collateral and the chance for prepayment--and gave him a printout from Bloomberg, but Cody did not seek out further information.

Cody knew that the security had an A rating, but did not know that it had been downgraded from AA by Fitch in October 2002. When asked whether he "really understood" the security at the time of the investments, Cody admitted, "At the time I sold it to them I didn't really look at a CMO [collateralized mortgage obligation] to be significantly different than any other bond; obviously, I've learned quite a bit since then." Cody bought the security the day after Skelly first mentioned them.

Over the next year, the Credit Suisse Security was downgraded several more times, with the Fitch rating declining to CCC in February 2004. The market price of the security dropped from $104 in February 2003 to $41 by February 2004. Over the next three months, Cody sold the DeSimones' investment at a loss of $17,377 (55 percent of their initial investment) and James Bates' investment at a loss of $56,868 (66 percent of his investment).

In 2003, Cody invested James Bates' money in three non-investment grade bonds. A bond with a rating of BBB- or higher from Standard and Poor's or Fitch or Baa3 or higher from Moody's is considered investment grade. Non-investment grade bonds, often referred to as "junk" bonds, have a rating of BB+ or lower from

Standard and Poor's or Fitch or Ba1 or lower from Moody's, and are considered to be speculative, with a higher degree of credit risk. Fabozzi, Bond Markets, Analysis, and Strategies 162-63 (6th ed. 2007).

These investments were made in May 2003, when Cody purchased Ahold Financial USA Inc. bonds, and in June, when he purchased Calpine Corp. and Royal Caribbean Cruises, Ltd. bonds. The Ahold and Calpine bonds were rated B1 by Moody's, and the Royal Caribbean bonds were rated Ba2 by Moody's. These bonds totaled about 23 percent of the market value of James Bates' IRA. Between July and November 2003, Cody sold all of the bonds, realizing a small gain on the investment, but the ratings were nevertheless for speculative grade bonds.

Cody engaged in frequent trading in 2003 and 2004 in James Bates' and Lenore DeSimone's IRAs. Cody made 140 trades (84 purchases and 56 sales) in Lenore DeSimone's IRA from June 2003 through May 2004. He engaged in a pattern of in-and-out trading, purchasing several securities and then selling those same securities just weeks later. The purchases totaled more than $1.3 million, while the average value of the account was just $421,000.

The trades generated over $36,000 in commissions to Leerink, with Cody personally getting over $14,000 in commissions. During that period, the account had a turnover ratio (annual purchases over average account value) of 3.4 and a commission to

equity ratio of 8.7 percent, meaning that the investments in the account would need to earn approximately 8.7 percent in annual returns just to break even after commissions.

In James Bates' account, Cody made 108 trades (69 purchases and 39 sales) from February 2003 through May 2004. Although there was not sufficiently precise information available to calculate turnover or commission ratios for this account, Cody made purchases of approximately $1.7 million during the 16-month period, when the total value of the account at the end of the month was always less than $475,000.

In addition, Cody employed a strategy of in-and-out trading and generated over $41,000 in commissions for Leerink, of which over $17,000 went to Cody. Around May 2004, Emma Bates questioned Cody about the trading in James Bates' account, and the level of trading in both James Bates' and Lenore DeSimone's accounts subsequently declined.

Cody also seemingly misled his clients in a number of his monthly reports by reporting bonds at par value, without a clear indication that this was so even when their market value was well below that figure, significantly overstating the value of their portfolios. After Cody left Leerink, Cody settled with the Bateses and DeSimones, agreeing to compensate the DeSimones $20,000 and the Bateses $56,000 for their losses on the Credit Suisse Security, but

he delayed the required reporting of this information to FINRA for over two years.

On January 11, 2008, the Department of Enforcement of FINRA filed a complaint against Cody. FINRA is a self-regulatory organization (SRO) that regulates professionals and firms in the securities industry, inheriting the responsibilities of two earlier similar bodies. Under the Securities Exchange Act, SROs such as FINRA can discipline members with penalties including expulsion, suspensions, and fines but must provide a hearing and written opinion and allow an administrative appeal. Loss, Seligman & Paredes, 6 Securities Regulation 199-200.

The complaint alleged violations of NASD Rule 2310 and NASD Rule 2110.[1] Rule 2310 requires:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

Rule 2110 requires representatives to "observe high standards of commercial honor and just and equitable principles of trade."

After a lengthy period of discovery, a three-member FINRA Hearing Panel conducted a five-day hearing from October 27, 2008,

---

[1]Because Cody's disputed conduct took place before FINRA amalgamated the functions of the National Association of Securities Dealers ("NASD") and the regulatory arm of the New York Stock Exchange ("NYSE"), the NASD pre-merger conduct rules applied.

through October 31, 2008.  At the hearing, Cody was represented by counsel, both sides presented documentary evidence, both sides called witnesses and cross-examined the other side's witnesses, and Cody himself testified.  The panel issued a written decision on January 29, 2009; the panel (unanimously) found

> -that in violation of Rule 2310 and Rule 2110 Cody engaged in excessive trading of Lenore DeSimone's and James Bates' IRA accounts by conducting in-and-out trading for risk averse investors in a way that generated substantial commissions for Cody and Leerink;
>
> -that (again citing both rules) the investments in the Credit Suisse Security were unsuitable because Cody did not understand the risks involved in the security [Add. 12-13], and the purchase of non-investment grade bonds for James Bates was unsuitable given James Bates' low risk tolerance; and
>
> -that in violation of Rule 2110 Cody's monthly statements were misleading and he improperly delayed the required reporting of his settlements with his clients.

The Hearing Panel imposed a fine of $20,000 and a three-month suspension for the unsuitable purchases and in-and-out trading (one panel member urged six months), a $5,000 fine for the misleading statements, and a $2,500 fine for the delayed reporting, producing a total fine of $27,500 (along with costs of $7,087.50) and a three-month suspension.  Both sides appealed and the Appeals Panel upheld liability (save on one unimportant detail) and affirmed all fines, and increased the suspension to a year,

concluding that a "stronger sanction is needed to remedy Cody's violations."

Cody petitioned the SEC to overturn the FINRA findings and penalties, save for the ruling about the monthly statements and delayed reporting of settlements, and the associated $7,500 in fines. The SEC, reviewing the record de novo and considering briefs from both sides, affirmed the liability findings on a preponderance of the evidence standard and affirmed the appellate body's sanctions, finding that they were not unnecessary or inappropriate or excessive or oppressive, the standard required for reversal of sanctions. 15 U.S.C. § 78s(e)(2) (2006).

In this court, we review the order of the SEC rather than FINRA's decisions. See 15 U.S.C. § 78y(a)(1); Krull v. SEC, 248 F.3d 907, 911 (9th Cir. 2001). The SEC's factual findings control if supported by substantial evidence, 15 U.S.C. § 78y(a)(4); A.J. White & Co. v. SEC, 556 F.2d 619, 621 (1st Cir.), cert. denied 434 U.S. 969 (1977), and its orders and conclusions must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).

Cody challenges the SEC's action on a number of grounds but, in the end, none is substantial. He begins by arguing that FINRA itself is a "state actor" endowed with governmental powers and is therefore required to provide due process under the Fifth Amendment. Two circuits have said no, others have expressed doubt

and one has dicta referring to due process as governing NASD rules.[2] There may be other such cases. This circuit has not addressed the issue, and it would be pointless to do so here.

By statute, FINRA was required to give Cody the substance of procedural due process. Gold v. SEC, 48 F.3d 987, 991 (7th Cir. 1995). In addition to providing "fair procedure," an SRO must "bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record." 15 U.S.C. § 78o-3(b)(8), (h)(1). FINRA did so here; and Cody nowhere explains just what would have been different if the administrative process for collecting evidence, compiling the record, evaluating Cody's conduct and imposing a sanction had been done in the first instance by the SEC itself.

The closest Cody comes is to argue that the Hearing Panel erred in refusing his request to offer expert testimony. The panel, like a court, had "broad discretion," Dep't of Enforcement v. Strong, No. E8A2003091501, 2008 FINRA Discip. LEXIS 19, at *17 (FINRA NAC Aug. 13, 2008), to exclude all evidence that is "irrelevant, immaterial, unduly repetitious, or unduly

---

[2]Compare Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 206 (2d Cir. 1999), cert. denied 531 U.S. 1069 (2001) (rejecting the state actor claim), and Epstein v. SEC, 416 Fed. Appx. 142, 148 (3d Cir. 2010) (unpublished opinion)(same), with Jones v. SEC, 115 F.3d 1173, 1183 (4th Cir. 1997), cert. denied 523 U.S. 1072 (1998), and Gold v. SEC, 48 F.3d 987, 991 (7th Cir. 1995)(expressing doubts), with Rooms v. SEC, 444 F.3d 1208, 1214 (10th Cir. 2006)(dicta that due process requires that a NASD rule give fair warning).

prejudicial." NASD Rule 9263(a). Cody sought to offer the testimony of Gerald A. Guild as an expert in fixed-income securities, but the Hearing Panel said it "would not be necessary or helpful to the Panel." A similar offer to the Appeals Panel was similarly rejected.

A panel comprised of those experienced in the industry was obviously less in need of expert advice than an ordinary judge or jury. But even in court a lawyer seeking to present expert testimony will, if doubts are expressed, need to tell the judge the substance of the proposed testimony and why it is needed. At the FINRA proceeding, Cody failed to do so; indeed, even today Cody does not tell us just what his expert was proposing to say. Without it, FINRA had no reason to conclude that the evidence was valuable, and nor do we.

Cody's next objection relates to the multiple roles played by attorney Michael Garawski, FINRA Associate General Counsel, who served as the Appeals Panel's counsel during Cody's administrative appeal, a role in which he ruled on various procedural motions by the parties. After Cody appealed the Appeals Panel's decision to the SEC, Garawski represented FINRA before the SEC, and was the attorney who signed FINRA's brief. Cody contends that Garawski's "dual role as adjudicator and advocate biased the outcome of the administrative proceedings."

The objection is not on its face a promising one. Government agencies, including the SEC itself, initially play the role of adjudicator when they resolve complaints and then in turn advocate when defending their resolution in court. This is not the same thing as taking sides as an advocate in a proceeding and _then_ purporting to adjudicate the disposition or the appeal from it. But something might turn on the circumstances and we have no occasion to explore the matter here because the objection has been forfeited.

Garawski openly assumed the dual role; Garawski's role at the FINRA Appeals Panel was known to Cody before FINRA's proceedings were over, and his role as an advocate before the SEC was known before the SEC proceedings were over. To preserve this issue for review, Cody had to raise it before the SEC and failed to do so. By statute, "[n]o objection to the order of the [SEC] shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure to do so." 15 U.S.C. § 80b-13(a). See Armstrong v. SEC, No. 09-1260, 2012 WL 1448980, at *2 (D.C. Cir. Apr. 25, 2012) (per curiam); Dyer v. SEC, 290 F.2d 534, 539 (8th Cir. 1961). That ends the matter.

Turning from procedural claims of error to substance, Cody argues that his choice of the Credit Suisse Security did not violate the suitability rule. Remarkably, he argues that an

-13-

investment recommendation is unsuitable only if the investment "on its face, is unsuitable for <u>any</u> investor."  Appellant's Br. 37 (emphasis added).  Cody's interpretation conflicts both with the rule's text and with any realistic policy designed to protect investors according to their circumstances.

The suitability rule requires reasonable grounds for the recommender to believe that "the recommendation is suitable for <u>such customer</u> upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and <u>as to his financial situation and needs</u>."  NASD Rule 2310 (emphasis added); <u>see also</u> <u>F. J. Kaufman & Co. of Va.</u>, 50 S.E.C. 164, 168 (1989) (requiring "a customer-specific determination of suitability").  And it is common sense that an investment that is suitable for some investors may be unsuitable for other investors with completely different investment objectives.

Cody also objects that, contrary to the findings of FINRA and the SEC, he had a sufficient understanding of the security to recommend it.  The fact that he recommended a risky security to customers who made clear their preference for safety strongly supports the opposite conclusion, and anyway Cody admitted at the FINRA hearing, "At the time I sold it to them I didn't really look at a CMO [collateralized mortgage obligation] to be significantly different than any other bond; obviously, I've learned quite a bit since then."

-14-

In particular, Cody did not know that the security's credit rating had been recently downgraded, he did not know that the security was one of the riskiest tranches of securities collateralized by the same pool of assets, and by his own admission, he did not understand that securities collateralized by housing assets have fundamentally different risks than traditional bonds that are backed by the credit of a government or a corporation. Nor does Skelly's recommendation immunize Cody. The responsibility to investigate belonged to Cody and the findings against him are plainly supported.

Finally, with regard to the Credit Suisse Security, Cody claims that he was misled or the Appeals Panel erred because in the hearing the security was often referred to as a collateralized mortgage obligation (CMO), while the Appeals Panel called the security an asset-backed security (ABS). But Cody had meaningful and adequate notice, and at no point was confused as to which securities were at issue.

ABSs are in some locutions a general class of all securities collateralized by financial assets while in the case of CMOs the assets happen to be mortgages.[3] Quite likely, the loans

---

[3]CMOs are defined as a class of ABSs by the Securities Exchange Act. See 15 U.S.C.A. § 78c(a)(79) (West 2012) ("The term 'asset-backed security'-- (A) means a fixed-income or other security collateralized by any type of self-liquidating financial asset . . . including--(I) a collateralized mortgage obligation . . . .").

and sales contracts in the Credit Suisse Security were secured by some kind of property interest in the mobile homes that could loosely be described as a chattel mortgage. Indeed, he testified that when he first learned of it Skelly informed him that the Credit Suisse Security "was an asset-backed security supported by mortgages on homes."

Even if the Credit Suisse Security arguably might be called something other than a CMO, on the theory that it was collateralized by assets other than mortgages, the FINRA complaint was sufficiently detailed to inform Cody that he was being charged with unsuitable recommendations of the Credit Suisse Security, regardless of whether it was better labeled a CMO or a non-CMO ABS. Cody, like everyone else involved, knew beyond any doubt what particular security was at issue and understood it was a security collateralized by housing installment loans and sales contracts.

Finally, Cody argues that FINRA and the SEC were wrong to find that the three non-investment grade bonds he purchased for James Bates were unsuitable. Cody says that James Bates began withdrawing $2,500 per month from his account--higher than the original plan of $2,000 per month--and so Cody needed to find investments that paid a higher yield. Since investment grade bonds did not pay a sufficiently high yield, Cody said that he "had to be creative" and invest in non-investment grade bonds; and in fact Cody sold them months later at a profit.

-16-

As the SEC noted, Cody's explanation is doubtful in light of the timing of the purchases;[4] but in any event Cody had no warrant for departing from the agreed investment strategy without Bates' agreement.  The fact that the investments ultimately turned a profit does not make the purchases suitable when made.  Eugene J. Erdos, 47 S.E.C. 985, 988 n.10 (1983).  The fault is taking the risk without authority; whether the investment succeeds or fails bears on civil damages but does not excuse professional misbehavior.

As for the finding that Cody engaged in excessive trading, which Cody also attacks, it appears well supported by the numbers of trades already set forth and by the large commissions generated by in-and-out trades by which investments are acquired and resold within weeks or even days.  Such a strategy is inappropriate for unsophisticated investors who desire a low-risk strategy to protect their retirement savings.  See Rafael Pinchas, 54 S.E.C. 331, 338-39 (1999).

Cody says that the enforcers focused on only twelve months for Lenore DeSimone and on sixteen months for James Bates and should have obtained numbers for the entire life of each account; but a year or more is not an insubstantial period and if

---

[4]Cody purchased the Ahold bonds before James Bates' first increased withdrawal, and he purchased the Calpine and Royal Caribbean bonds within days of James Bates' first increased withdrawal.

a representative engages in unsuitable excessive trading for a meaningful period of time, he should not be excused by the fact that there was some other time that he may not have engaged in excessive trading. See Jack. H. Stein, 56 S.E.C. 108, 118 n.30 (2003).

In a variant of this argument, Cody criticizes the findings for concentrating on Lenore DeSimone's IRA instead of considering all of the DeSimones' accounts together; but Lenore DeSimone indicated that the accounts had different objectives, with the IRA meant for safe bonds but with some other accounts geared toward more aggressive or risky investments. So the focus was entirely appropriate. See Frederick C. Heller, 51 S.E.C. 275, 279 (1993).

Next, Cody notes that FINRA did not find that he was engaged in excessive trading with the wrongful intent of enriching himself. But while subjective intent is relevant to churning charges under the anti-fraud regulation of Rule 10b-5, Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th Cir. 1980), NASD's suitability rule is violated when a representative engages in excessive trading relative to a customer's financial needs, Erdos v. SEC, 742 F.2d 507, 508 (9th Cir. 1984), regardless of motivation, First Sec. Corp., 40 S.E.C. 589, 592 (1961).

Lastly, Cody stresses the fact that one of the exhibits offered against him on the excessive trading charge, which

-18-

presented turnover and commission to equity ratios for James Bates' accounts, turned out to have errors and was excluded.  Cody then suggests that somehow the errors infected the entire analysis.  The panel admitted the other exhibits that underpin the charge; and the Hearing Panel, Appeals Panel and SEC scrupulously avoided relying on the flawed evidence.

<u>Affirmed</u>.