**STEER WEALTH MANAGEMENT, LLC, Appellant**

v.

**Margaret DENSON, a Texas Resident Individual, Suing Individually and as Executor of the Estate of John David Denson, Appellee**

**NO. 01-17-00066-CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued September 7, 2017

Donald R. Littlefield, Susan A. Logsdon, BALLARD & LITTLEFIELD, LLP, 3700 Buffalo Speedway, Suite 250, Houston, TX 77098, for Appellant.

Samuel B. Edwards, Ryan S. Cook, SHEPHERD, SMITH, EDWARDS & KANTAS, LLP, 1010 Lamar Street, Suite 900, Houston, TX 77002, Matthrew J.M. Prebeg, Brent T. Caldwell, PREBEG, FAUCETT & ABBOT, PLLC, for Appellee.

Panel consists of Chief Justice Radack and Justices Keyes and Massengale.

## OPINION

Evelyn V. Keyes, Justice

In this interlocutory appeal, Margaret Denson, in her individual capacity and as executor of the estate of her late husband, John David Denson, sued Steer Wealth Management, LLC, for causes of action including breach of contract and fraud arising out of the alleged improper transfer of assets from several of the Densons' brokerage accounts. Steer Wealth moved to compel arbitration and stay all trial court proceedings, and the trial court denied the motion. In one issue, Steer Wealth contends that the trial court erred in denying its motion because it can compel arbitration as a third-party beneficiary to an arbitration agreement the Densons had signed with another entity and it can compel arbitration under the doctrine of direct-benefits estoppel.

We affirm.

## Background

In the early 2000s, Jack Varcados, who was employed by Morgan Stanley at the time, became the financial advisor for John and Margaret Denson and opened numerous brokerage accounts for them, including joint accounts, trust accounts, accounts in John Denson's name, and accounts in Mar-

garet Denson's name. Varcados was later employed by Merrill Lynch and then by LPL Financial, LLC, and each time he switched employers the Densons transferred their brokerage accounts to his new firm. Varcados began opening brokerage accounts for the Densons with LPL Financial in 2009, and the Densons continued applying for new brokerage accounts with LPL Financial through January 2013.

Each account application contained a provision directly above the signature lines that stated:[1] "This account is governed by and I acknowledge receipt of the predispute arbitration clause that is located in the last numbered section of the Account Agreement ... which is incorporated by reference into the Account Application." The account applications were signed by the Densons and Varcados, on behalf of LPL Financial. The "LPL Master Account Agreement" included the following arbitration provision:

**ARBITRATION AGREEMENT**

Disclosures

By signing this Arbitration Agreement the parties agree as follows:

(A) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

. . . .

(F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

(G) The rules of the arbitration forum in which the claim is filed, and any

amendments thereto, shall be incorporated into this agreement.

In consideration of opening one or more accounts for you, you agree that any controversy between you and LPL and/or your Representative(s) (whether or not a signatory(ies) to this Master Account Agreement or Arbitration Agreement), arising out of or relating to your account, transactions with or for you, or the construction, performance, or breach of this agreement whether entered into prior, on or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules, then in effect of the Financial Industry Regulatory Authority. Any arbitration award hereunder shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction. You understand that you cannot be required to arbitrate any dispute or controversy nonarbitrable under federal law.

The Master Account Agreement defined "Representative" as the customer's "registered representative."

In May 2011, Varcados, with the assistance of Tan Tang, the initial organizer, formed Steer Wealth, a domestic limited liability company, and he is the sole manager of this entity. Varcados's "Broker-Check" Report with the Financial Industry Regulatory Agency ("FINRA") lists Steer Wealth as a "DBA for LPL business (entity for LPL business)." Steer Wealth presented evidence indicating that LPL Financial had approved Varcados's use of Steer Wealth as an "outside business." The record does not contain any contracts between the Densons and Steer Wealth, and it is undisputed that Steer Wealth is not a

---

1. Although the wording of the arbitration clause varied slightly among the applications, each account application contained an arbitration clause, and each clause was substantively identical.

signatory to any contracts between the Densons and LPL Financial.

John Denson died in November 2013. After his death, Margaret Denson discovered that John Denson had allegedly transferred millions of dollars' worth of assets from their joint brokerage accounts at LPL Financial into accounts in either his name or in the name of companies that he owned. John Denson designated Tan Tang, his law partner and alleged mistress, as the beneficiary of those accounts. Margaret Denson filed suit against Tang in December 2013, seeking damages for breach of fiduciary duty, conversion, and fraud on the community. In this lawsuit, Denson also sought a temporary restraining order and temporary injunction prohibiting Tang and LPL Financial, among other entities, from transferring any assets held in an account on which John Denson was a signatory. Steer Wealth was not a party to this lawsuit. Ultimately, Denson nonsuited her claims against LPL Financial after that entity moved to compel arbitration. Denson, Tang, and LPL Financial reached a settlement, pursuant to which the beneficiary designations in favor of Tang on seven brokerage accounts held with LPL Financial were set aside and the accounts were transferred to Denson at a different financial institution.

In February 2016, Denson sued Steer Wealth in the underlying suit. Denson alleged that Steer Wealth and Varcados, who is not a defendant in the underlying suit, were financial advisors to John Denson, Tang, and their law firm. Denson alleged that she, her husband, Tang, and Tang and John Denson's law firm were all clients of Steer Wealth. Denson further alleged that Steer Wealth assisted Tang "in improperly depleting the Denson community estate of its financial assets, and concealing these actions from Mrs. Denson."

Denson asserted a cause of action against Steer Wealth for breach of contract, alleging:

> The Densons entered into one or more oral and/or written agreements with Mr. Varcados, through his company, [Steer Wealth], under which [Steer Wealth] would act as the Densons' financial and investment advisor and provide the Densons other financial services. [Steer Wealth] therefore owed Mrs. Denson, as its client, numerous contractual (as well as legal, equitable, and ethical) duties. These included, but were not limited to, the contractual obligation to act for Mrs. Denson's financial benefit, and concomitantly to refrain from acts or omissions recklessly or knowingly causing Mrs. Denson financial harm.[2]

Denson also asserted causes of action for promissory estoppel, common law fraud, fraud by nondisclosure, tortious interference with inheritance rights, breach of fiduciary duty, civil conspiracy, and aiding and abetting. Denson alleged, with respect to her promissory estoppel claim, that Steer Wealth "explicitly or implicitly promised … that [it] would act in good faith to treat Mrs. Denson fairly as a client…." Denson also alleged, with respect to her common law fraud claim, that Steer Wealth, through Varcados, fraudulently induced her "to enter into contracts with [Steer Wealth] and to agree to place her money under [Steer Wealth's] management and care on the basis of … fraudulent representations." Denson alleged that Steer Wealth "had fiduciary and other duties to its client, Mrs. Denson," and she

---

**2.** The record does not include any contracts to which the Densons and Steer Wealth were signatories. The only contracts in the record are between the Densons and LPL Financial, with Varcados signing on behalf of LPL Financial.

repeatedly alleged that she was a client of Steer Wealth.

After it answered, Steer Wealth moved to compel arbitration and to stay all proceedings in the trial court. Steer Wealth argued that all of Denson's claims were subject to the mandatory arbitration provision contained in the LPL account agreements. Steer Wealth acknowledged that it was not a signatory to the LPL account agreements, but it argued that it could enforce the arbitration agreement because it—as a "DBA for Jack Varcados to conduct his LPL business" and thus as a "Representative" as defined in the arbitration agreement—was a third-party beneficiary of the LPL arbitration agreement. Steer Wealth also argued that it could enforce the arbitration agreement under a direct-benefits estoppel theory because all of Denson's claims against Steer Wealth "flow from the account agreements between the Densons and LPL," and Denson, therefore, could not seek "the benefits of her LPL Account Agreements while simultaneously attempting to avoid the agreements' burdens, such as the obligation to arbitrate disputes." Steer Wealth argued that the case in the trial court should be stayed pending resolution of the arbitration proceeding.

Denson filed a response in opposition to Steer Wealth's motion to compel arbitration. Denson argued that Steer Wealth, as a registered limited liability company, was a separate entity from Varcados and could not be a "DBA," as Steer Wealth claimed. As a result, Steer Wealth could not be considered a "Representative," as defined in the arbitration agreement. Denson also argued that because Steer Wealth was not a member of FINRA, FINRA would not accept a claim involving that entity for arbitration; thus, dismissing Denson's suit against Steer Wealth in favor of arbitration would leave her without a forum to

adjudicate her claims. Denson further argued that Steer Wealth could not rely upon Denson's arbitration agreement with LPL Financial because it could not be considered an intended third-party beneficiary of the Densons' contracts with LPL Financial and because Denson's claims against Steer Wealth did not seek benefits from her contracts with LPL Financial, thus precluding direct-benefits estoppel. Denson argued that she "had business relationships with two separate companies: LPL [Financial] and [Steer Wealth]" and that her claims against Steer Wealth do not rely upon her contracts with LPL Financial. She argued that Steer Wealth could not identify any provision in her contracts with LPL Financial in which she agreed to arbitrate her dispute with Steer Wealth.

The trial court denied Steer Wealth's motion to compel arbitration. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West 2015) (permitting interlocutory appeal in cases subject to Federal Arbitration Act if that Act authorizes appeal); *see also* 9 U.S.C.S. § 16 (LexisNexis 2008) (permitting appeal of order denying motion to compel arbitration).

### Motion to Compel Arbitration

In its sole issue, Steer Wealth contends that the trial court abused its discretion in denying Steer Wealth's motion to compel arbitration and stay all trial court proceedings. It argues that, although not a signatory to any arbitration agreement with Denson, it can enforce Denson's arbitration agreement with LPL Financial under either a third-party beneficiary or a direct-benefits estoppel theory.

### A. Applicable Law

The Federal Arbitration Act ("FAA") provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*See* 9 U.S.C.S. § 2 (LexisNexis 2008); *see also* 9 U.S.C.S. § 1 (LexisNexis 2008) (defining "commerce" to mean, among other things, "commerce among the several States"). "This provision extends to all transactions affecting commerce and is coextensive with the reach of the Commerce Clause of the United States Constitution." *Wachovia Sec., LLC v. Emery*, 186 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The sale of securities involves interstate commerce. *Id.* at 112; *see also Eurocapital Grp., Ltd. v. Goldman Sachs & Co.*, 17 S.W.3d 426, 430 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (holding that contract at issue was account agreement with brokerage firm that dealt with sale of securities and thus involved interstate commerce).

▮ We review a trial court's decision to grant or deny a motion to compel arbitration for an abuse of discretion. *Amir v. Int'l Bank of Commerce*, 419 S.W.3d 687, 691 (Tex. App.—Houston [1st Dist.] 2013, no pet.). We defer to a trial court's factual determinations if they are supported by evidence, but we review a trial court's legal determinations de novo. *Id.* In general, a party seeking to compel arbitration under the FAA must establish that (1) there is a valid agreement to arbitrate and (2) the claims raised fall within the scope of that agreement. *In re Kellogg Brown & Root,*

*Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding). Because there is a presumption favoring agreements to arbitrate under the FAA, courts resolve doubts regarding an agreement's scope in favor of arbitration. *Id.* This presumption only arises, however, after the party seeking to compel arbitration proves that a valid arbitration agreement between the parties exists. *Id.* (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)). "Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (orig. proceeding). Whether a valid arbitration agreement exists is a question of law that we review de novo. *Amir*, 419 S.W.3d at 691 (citing *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig. proceeding)).

### B. Whether Steer Wealth, A Non-Signatory Defendant, Can Compel Arbitration

▮ Under the FAA, we apply ordinary principles of state contract law to determine whether a valid agreement to arbitrate exists. *In re Kellogg Brown & Root*, 166 S.W.3d at 738. "Because arbitration is contractual in nature, the FAA generally 'does not require parties to arbitrate when they have not agreed to do so.'" *Id.* (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989)). However, "non-signatories to an arbitration agreement can sometimes compel arbitration or be compelled to arbitrate." *Amateur Athletic Union of the U.S., Inc. v. Bray*, 499 S.W.3d 96, 103–04 (Tex. App.—San Antonio 2016, no pet.); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632, 129 S.Ct. 1896, 1903, 173 L.Ed.2d 832 (2009) (holding that litigant

who was not party to relevant arbitration agreement may invoke provisions of FAA if relevant state contract law allows nonparty to enforce agreement); *In re Rubiola*, 334 S.W.3d at 224–25 (addressing question of whether non-signatories to contract containing arbitration clause could compel arbitration).

One purpose of the FAA is "to make arbitration agreements as enforceable as other contracts, but not more so." *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S.Ct. 1801, 1806 n.12, 18 L.Ed.2d 1270 (1967)). "As a general rule, 'an arbitration clause cannot be invoked by a non-party to the arbitration contract.'" *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015) (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 532 (5th Cir. 2000)); *Parker v. Schlumberger Tech. Corp.*, 475 S.W.3d 914, 923 (Tex. App.—Houston [1st Dist.] 2015, no pet.). However, courts have recognized six theories that allow non-signatories to enforce arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary. *See G.T. Leach Builders*, 458 S.W.3d at 524 (citing *In re Kellogg Brown & Root*, 166 S.W.3d at 739); *see also Arthur Andersen*, 556 U.S. at 631, 129 S.Ct. at 1902 (noting that "traditional principles of state law" allow contracts to be enforced by or against nonparties through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel"); *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678 (Tex. 2006) (orig. proceeding) ("We have recently held that under certain circumstances a party to an arbitration agreement may be compelled to arbitrate claims with a nonparty if the controversy arises from a contract containing an arbitration clause.").

### 1. Third-Party Beneficiary

Steer Wealth first argues that, although it is a non-signatory to the contracts between Denson and LPL Financial that contain an arbitration clause, it is entitled to enforce the arbitration clause because it is a third-party beneficiary to the contracts.

A third-party beneficiary may enforce a contract to which it is not a party "if the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit." *In re Palm Harbor Homes*, 195 S.W.3d at 677. Similarly, signatories to an arbitration agreement "may identify other parties in their agreement who may enforce arbitration as though they signed the agreement themselves." *In re Rubiola*, 334 S.W.3d at 226. The fact that a person might receive an incidental benefit from a contract to which it is not a party does not give that person a right of action to enforce the contract. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). The intent to contract or confer a direct benefit to a third party "must be clearly and fully spelled out or enforcement by the third party must be denied." *Id.* A presumption therefore exists that parties to a contract contracted for themselves unless it "clearly appears" that they intended for a third party to benefit from the contract. *Id.*; *see In re Bayer Materialscience, LLC*, 265 S.W.3d 452, 456 (Tex. App.—Houston [1st Dist.] 2007, orig. proceeding) ("Any doubt concerning intent should be resolved against the third party.").

Steer Wealth argues that it is a third-party beneficiary of Denson's contracts with LPL Financial because the express

language of the arbitration agreement provides that it applies to controversies "between [Denson] and LPL and/or your Representative(s)," which, it contends, refers to Varcados and Steer Wealth as his "DBA." It contends that because it can act only through Varcados, its sole manager, "[b]y its own terms, the LPL arbitration provision is intended to benefit Steer Wealth which is a DBA for Varcados, the 'Representative' identified in the arbitration provision." We disagree.

 As Denson points out, "[a] DBA is no more than an assumed or trade name. And it is well-settled that a trade name has no legal existence." *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 438 (Tex. App.—Dallas 2010, no pet.). A limited liability company, however, is a separate legal entity from its members. *Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 109 (Tex. App.—San Antonio 2011, pet. denied) (noting that members and managers of limited liability company are legally distinct from company itself). Although there is evidence in the record that Varcados uses Steer Wealth to conduct his financial advising business for LPL Financial, there is also evidence in the record that Steer Wealth is a registered domestic limited liability company and is therefore a distinct legal entity from both Varcados and LPL Financial. We thus agree with Denson that Varcados and Steer Wealth cannot be conflated such that references in the Master Account Agreement—and its arbitration provision—to Denson's "Representative" refer to both Varcados and the separate legal entity of Steer Wealth.

To establish that it is a third-party beneficiary of the Master Account Agreement, such that it can enforce the contract despite not being a signatory to it, Steer Wealth needed to demonstrate that the parties to the contract—the Densons and LPL Financial—"intended to secure a benefit to [Steer Wealth] and entered into the contract directly for [Steer Wealth's] benefit." *See In re Palm Harbor Homes*, 195 S.W.3d at 677; *see also MCI Telecomm. Corp.*, 995 S.W.2d at 651 (stating that intent to contract for benefit of third party "must be clearly and fully spelled out or enforcement by the third party must be denied"). Steer Wealth argues that the language of the arbitration provision itself demonstrates the parties' intent to benefit Steer Wealth because the provision applies to controversies "between [Denson] and LPL and/or your Representative(s)." As Steer Wealth acknowledges, "Representative" is defined in the Master Account Agreement as Denson's "registered representative." As Denson points out, however, "registered representative" is a term of art referring to "a person who has passed an examination administered by FINRA and obtained a license to solicit, purchase, and sell securities while working with a member firm of FINRA." *Dougherty v. VFG, LLC*, 118 F.Supp.3d 699, 710 n.6 (E.D. Pa. 2015); *see also Cody v. Sec. & Exch. Comm'n*, 693 F.3d 251, 254 (1st Cir. 2012) (stating same). Although Varcados, as a person who has passed FINRA examinations and obtained a license, can be a "registered representative," Steer Wealth, an entity and not a natural person, cannot be. We therefore agree with Denson that the terms of the arbitration provision itself do not contemplate that Steer Wealth—a party not named in the arbitration provision, the Master Account Agreement, or the account applications—may rely upon that provision or benefit from it.

Steer Wealth has presented no other evidence that the Densons and LPL Financial clearly intended to secure a benefit to Steer Wealth when the parties signed

the account applications and entered into the Master Account Agreements at issue. Because it does not "clearly appear" that the parties intended for Steer Wealth, a third party, to benefit from their contract, we presume the parties contracted solely for themselves. *See MCI Telecomm. Corp.*, 995 S.W.2d at 651. We therefore conclude that the trial court did not err to the extent that it denied Steer Wealth's motion to compel arbitration on the basis that it was not a third-party beneficiary to the contracts between the Densons and LPL Financial.

### 2. *Direct-Benefits Estoppel*

Steer Wealth also argues that it may enforce the arbitration agreement because Denson, in her claims against Steer Wealth, seeks to benefit by holding it liable based on duties imposed by her contracts with LPL Financial, which contain arbitration clauses. Denson argues, however, that she alleged a contractual relationship with Steer Wealth separate from her relationship with LPL Financial, that her claims against Steer Wealth do not rely upon her contracts with LPL Financial, and that there is no evidence that she agreed to arbitrate her claims against Steer Wealth.

■■■ Non-signatories may also enforce an arbitration agreement under estoppel theories. *See In re Kellogg Brown & Root*, 166 S.W.3d at 739; *see also Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006) ("[S]ometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa."). Texas law "requires a nonparty to arbitrate a claim 'if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.'" *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761 (Tex. 2006) (orig. proceeding) (per curiam) (quoting *In re Kellogg Brown & Root*, 166 S.W.3d at 741); *see*

*G.T. Leach Builders*, 458 S.W.3d at 527 (stating that signatory plaintiff "cannot 'have it both ways'; it cannot 'on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory'"); *Meyer*, 211 S.W.3d at 305 ("[A] person who seeks by his claim 'to derive a direct benefit from the contract containing the arbitration provision' may be equitably estopped from refusing arbitration.") (quoting *In re Vesta Ins. Grp.*, 192 S.W.3d at 761).

■■■ The Texas Supreme Court has held:

> Under both Texas and federal law, whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading. Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract or must be determined by reference to it. On the other hand, claims can be brought in tort (and in court) if liability arises from general obligations imposed by law.

*In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131–32 (Tex. 2005) (orig. proceeding); *In re Vesta Ins. Grp.*, 192 S.W.3d at 761 ("[N]onparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law."). Direct-benefits estoppel does not "create liability for noncontracting parties that does not otherwise exist," and the doctrine does not apply "when the benefits alleged are insubstantial or indirect." *In re Weekley Homes*, 180 S.W.3d at 134.

If a plaintiff's right to recover and her damages depend on the agreement containing the arbitration provision, the party

is relying on the agreement for her claims. *See Meyer*, 211 S.W.3d at 307; *VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 832 (Tex. App.—Dallas 2013, no pet.) ("Generally, if the facts alleged 'touch matters,' have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract containing the arbitration provision, the claim is arbitrable."); *In re Trammell*, 246 S.W.3d 815, 821 (Tex. App.—Dallas 2008, no pet.) ("When each of a signatory's claims against a nonsignatory references or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.").

■ If, however, the facts alleged in support of the claim stand alone and are completely independent of the contract containing the arbitration provision, and the claim can be maintained without reference to the contract, the claim is not subject to arbitration. *VSR Fin. Servs.*, 409 S.W.3d at 832 (quoting *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, orig. proceeding)); *see also G.T. Leach Builders*, 458 S.W.3d at 527 ("It is not enough, however, that the party's claim 'relates to' the contract that contains the arbitration agreement. Instead, the party must seek 'to derive a direct benefit'—that is, a benefit that 'stems directly'—from that contract.") (internal citations omitted).

■ Parties to an arbitration agreement "may not evade arbitration through artful pleading." *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 188 (Tex. 2007) (orig. proceeding). Corporations and other business entities "can act only through human agents," and as a result, "many business-related torts can be brought against either a corporation or its employees." *Id.* "If a plaintiff's choice between suing the corporation or suing the employees determines whether an arbitration agreement is binding, then such agreements have been rendered illusory on one side." *Id.* at 188–89. "When contracting parties agree to arbitrate all disputes 'under or with respect to' a contract ... they generally intend to include disputes about their agents' actions because '[a]s a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts.'" *In re Vesta Ins. Grp.*, 192 S.W.3d at 762 (quoting *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995)).

■ A corporate relationship between entities, however, is generally not enough to bind a nonsignatory to an arbitration agreement. *In re Merrill Lynch Trust Co.*, 235 S.W.3d at 191. Corporate affiliates are "generally created to separate the businesses, liabilities, and contracts of each," and thus, "a contract with one corporation—including a contract to arbitrate disputes—is generally not a contract with any other corporate affiliates." *Id.*

It is undisputed that Denson and her late husband signed numerous account applications with LPL Financial concerning the opening of various types of brokerage accounts. Varcados signed these applications as a representative of LPL Financial. Each of these account applications included a provision stating that the account was subject to a predispute arbitration clause located in the Master Account Agreement. Each Master Account Agreement contained a substantively identical arbitration provision stating, among other things,

> In consideration of opening one or more accounts for you, you agree that any controversy between you and LPL and/or your Representative(s) (whether or not a signatory(ies) to this Master Account Agreement or Arbitration Agreement), arising out of or relating to

your account, transactions with or for you, or the construction, performance, or breach of this agreement whether entered into prior, on or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules, then in effect of the Financial Industry Regulatory Authority.

It is further undisputed that Steer Wealth was not a signatory to the account applications that incorporated the Master Account Agreements.

After John Denson's death in 2013, Denson learned that her husband had allegedly transferred funds out of their joint brokerage accounts into accounts in John Denson's name, Tan Tang's name, or in the name of entities controlled by John Denson and Tang. In the underlying suit, Denson asserted causes of action against Steer Wealth—but not against LPL Financial or Varcados—for breach of contract, promissory estoppel, fraud, breach of fiduciary duty, tortious interference with inheritance rights, civil conspiracy, and aiding and abetting. Denson alleged that she had a contractual relationship with Steer Wealth, asserting,

> The Densons entered into one or more oral and/or written agreements with Mr. Varcados, through his company, [Steer Wealth], under which [Steer Wealth] would act as the Densons' financial and investment advisor and provide the Densons other financial services. [Steer Wealth] therefore owed Mrs. Denson, as its client, numerous contractual (as well as legal, equitable, and ethical) duties. These included, but were not limited to, the contractual obligation to act for Mrs. Denson's financial benefit, and concomitantly to refrain from acts or omissions recklessly or knowingly causing Mrs. Denson financial harm.

Denson also alleged that Steer Wealth, through Varcados, fraudulently induced her "to enter into contracts with [Steer Wealth] and to agree to place her money under [Steer Wealth's] management and care on the basis of . . . fraudulent representations." Denson repeatedly alleged that she was a client of Steer Wealth, that Steer Wealth owed duties, including both contractual and fiduciary duties, to her as its client, and that it breached those duties to her.

In the trial court, Steer Wealth argued, as it does in its reply brief on appeal, that "Mr. and Mrs. Denson do not have any contractual agreements with Defendant Steer Wealth." However, Steer Wealth never provided any evidence, such as an affidavit from Varcados, to this effect. Instead, it relied solely on the argument of counsel that there were no agreements between itself and the Densons that required it to act for Mrs. Denson's benefit and to refrain from acts or omissions that recklessly or knowingly caused her harm. As the party seeking to compel arbitration, Steer Wealth bore the burden to establish that a valid agreement to arbitrate exists, which, in this case, involved the "gateway matter" of whether Steer Wealth, a nonsignatory to Denson's contracts with LPL Financial, could enforce the arbitration agreement contained in those contracts under Texas law. *See In re Rubiola*, 334 S.W.3d at 223–24; *see also In re Kellogg Brown & Root*, 166 S.W.3d at 737 (holding that party seeking to compel arbitration under FAA must establish existence of valid agreement to arbitrate); *VSR Fin. Servs.*, 409 S.W.3d at 828 ("The burden of showing a right to enforce an arbitration agreement, as with the overall burden of establishing the existence of an arbitration agreement, is generally evidentiary.").

▮ In light of Denson's allegations that she and her husband had a contractual relationship with Steer Wealth in which Steer Wealth allegedly agreed to provide

financial and investment advice and other services—allegations unrebutted by evidence to the contrary—we conclude that Denson's allegations refer to a separate contractual agreement with Steer Wealth, as opposed to a contractual agreement with LPL Financial. *See G.T. Leach Builders*, 458 S.W.3d at 528–29 (noting, in holding that non-signatory defendants were not entitled to enforce arbitration agreement under equitable estoppel theory, that plaintiff was not suing defendants for breach of obligations in general contract that contained arbitration agreement, but was instead alleging that defendants breached duties "that they each 'contractually agreed' to perform" in separate agreements that did not contain arbitration provisions); *see also In re Merrill Lynch Trust Co.*, 235 S.W.3d at 191 (noting that plaintiffs signed agreement with Merrill Lynch that had arbitration provision, but affiliate-defendants "signed their own contracts with the plaintiffs, which had no arbitration clauses" and holding that allowing non-signatory affiliates to compel arbitration "would effectively rewrite their contracts" with plaintiffs).

Thus, although Denson's claims against Steer Wealth may "relate to" Denson's contracts with LPL Financial, her breach of contract and other claims against Steer Wealth "arise out of" and "directly seek the benefits of" a separate and independent alleged contract between Denson and Steer Wealth for the provision of financial services to Denson by Steer Wealth. *See G.T. Leach Builders*, 458 S.W.3d at 528–29; *see also In re Kellogg Brown & Root*, 166 S.W.3d at 739–40 ("If, however, a non-signatory's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory."). Denson's claims against Steer Wealth "do not, on their face, seek a 'direct benefit'" under her contracts with LPL Financial; instead, "the record at this stage indicates that [Denson] seek[s] direct benefits under other alleged contracts." *See G.T. Leach Builders*, 458 S.W.3d at 529; *see also In re Kellogg Brown & Root*, 166 S.W.3d at 741 (concluding that under direct-benefits estoppel theory, fact that non-signatory's claim may relate to contract containing arbitration provision "does not, in itself, bind the non-signatory to the arbitration provision"). We therefore conclude that Steer Wealth has not established that direct-benefits estoppel applies in this case to allow it, as a non-signatory to Denson's contracts with LPL Financial, to enforce the arbitration provision contained in those contracts. *See VSR Fin. Servs.*, 409 S.W.3d at 829 (stating that non-signatory defendant failed to carry its burden of establishing it was party to contract and entitled to enforce arbitration provisions). We hold that the trial court did not err in denying Steer Wealth's motion to compel arbitration.

We overrule Steer Wealth's sole issue.

### Conclusion

We affirm the order of the trial court.