**Opinion issued June 28, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00451-CV

————————————

**ALAN DAVIS, JOHN MAHONY, THE MAHONY GROUP, LLP, AND MICHAEL W. FOULARD, Appellants**

**V.**

**MSR HOLDINGS, LLC AND MARRICK MEDICAL FINANCE, LLC, Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-68569**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court rendered judgment in favor of appellee MSR Holdings, LLC against appellants (1) Alan Davis, (2) John Mahony, (3) The Mahony Group, LLP, and (4) Michael W. Foulard based on the trial court's

determination that they had violated the Texas Securities Act related to the sale of securities in Iomnis Surveillance Solutions, LLC (Iomnis). The trial court also rendered judgment against Davis and Foulard in favor of Marrick Medical Finance, LLC (Marrick) after determining that Davis and Foulard had breached an agreement under which the trial court determined Marrick was a third-party beneficiary.[1] On appeal, the dispositive issues that we address are whether the evidence was legally and factually sufficient to support liability under the Texas Securities Act, whether Marrick was a third-party beneficiary under the agreement, and whether the statute of frauds barred enforcement of the agreement.

We affirm in part and reverse and render in part.

## Background

### A. Iomnis's Company Structure

Formed in 2011, Iomnis made and sold computer servers to operate surveillance systems. Ownership in the company was divided into classes of membership units, including Class A Membership Units and Common Membership Units. Initially, Foulard was the only owner of Class A Membership Units. In 2013, Foulard and his wife Georgia divorced, and she received part of his units. The

---

[1] The judgment also awarded damages against Iomnis and Shelby Beard, but neither have filed a notice of appeal.

2

following year, Foulard sold 10 percent of his units to Dynarock Affiliates, LLC, a company owned in part by his estranged son, George.

On December 30, 2014, an amended company agreement for Iomnis (Company Agreement) was signed. A schedule attached to the Company Agreement reflected the ownership interests of the three Class A Members: (1) Foulard owned an 18.56 percent interest, (2) Georgia owned a 29.95 percent interest, and (3) Dynarock owned an 11.39 percent interest. The schedule also reflected that Iomnis had two owners of Common Membership Units: (1) Alan Davis—Iomnis's chief executive officer and president—who owned a 20.60 percent interest, and (2) Shelby Beard—vice president of sales and marketing—who owned a 15.50 percent interest.[2]

The Company Agreement provided that the "Board of Managers shall exercise complete and exclusive control of the management of [Iomnis's] business and affairs, and have the right, power, and authority on behalf of the Company, and in its name, to exercise all of the rights, power, and authorities of the Company." The Board of Managers was comprised of five managers: three Class A Managers—Foulard, Georgia, and George—and two Common Managers—Davis and Beard. George served as chairman of the Board.

---

[2] There was a third category of members—"Profits Interest Members."—who owned a combined four percent interest in Iomnis. But they did not have voting interests, and their interests were not relevant to any issue in this case.

The Company Agreement stated that "[t]he vote of the majority of the Class A Managers shall constitute the act of the Board." To issue new membership units or other forms of new membership interest, the Company Agreement required "prior written vote or consent of the Members holding a Supermajority Interest." The agreement defined "Supermajority Interest" to mean "(a) members whose aggregate Voting Percentage Interests exceed sixty-six and two-thirds percent (66-2/3%) and (b) the majority of the Class A Members." The schedule showed that each member's respective "voting percentage interest" varied slightly from his or her ownership interest. Foulard's voting percentage interest was 19.37 percent, Georgia's was 31.20 percent, Dynarock's was 11.83 percent, Davis's was 21.45 percent, and Beard's was 16.15 percent.

Although he had an ownership interest in Iomnis since its inception, Foulard was never an officer or employee, and he was not involved in Iomnis's day-to-day operations. Davis testified that, as Iomnis's president, he made the "everyday decisions" for the company. Davis explained that, before Foulard and Georgia divorced, he would go to Foulard for financial decisions, but, after the divorce, he reported to a "supermajority [of the] Class A Members"—meaning two of the three Class A Members. Davis testified that, for financial decisions, he "typically" went first to George, the Chairman of the Board, but, at times, he went to all three Class A Members—Foulard, Georgia, and George.

The divorce between Foulard and Georgia was acrimonious. Foulard testified that, when George purchased the Class A Membership Units from him and became Chairman of the Board, he and George were estranged. The evidence at trial showed that George and Georgia always voted the same on matters brought to the Board, thereby constituting a supermajority voting interest that would control on matters affecting Iomnis's management.

Foulard testified that, since the divorce, he had not communicated with Georgia. While he had since reconciled with George, Foulard indicated that the communications he had with George through 2015 were acrimonious. Because of the discord, Foulard testified that, after George and Georgia became members, he "c[a]me to the conclusion . . . that it probably wouldn't be a great idea for me to continue my involvement with Iomnis, if possible, in light of the fact that there was a lot of acrimony," which caused him to lose sleep and impacted his ability to manage another company, Gulfstream, his primary business.

Even before the divorce, the evidence showed that Foulard's involvement in Iomnis was limited. He testified that he attended a few board meetings, a convention, and one company presentation, but he was not involved in the technical or planning side of the business. Foulard's business, Gulfstream, had provided office space for Iomnis but Iomnis moved out before 2015. Gulfstream's chief financial officer,

Becky Clamp, had also provided accounting services for Iomnis, but, by January 2015, she had stopped providing those services.

## B.    Iomnis's Financial Issues

By 2015, Iomnis was struggling financially, and its members had been loaning it money to cover its expenditures. In 2014, Foulard loaned Iomnis $820,504 and Dynarock loaned it over $900,000. In the first half of 2015, Georgia loaned Iomnis $975,000, and Davis loaned it $513,898. Despite the loans, Iomnis could not pay all of its expenses. For instance, Iomnis had not paid some of its employees and owed some of its salespeople commissions. Iomnis was also unable to pay its primary vendor, Dell, from which Iomnis purchased the hardware it needed to make the product it sold. By mid-2015, the Dell account was delinquent with Iomnis owing Dell over $1.3 million. Dell had placed a hold on Iomnis's account and did not sell any hardware to Iomnis for 90 days.

In addition, Iomnis owed $170,000 to John Mahony for consulting services that he and his company, The Mahony Group, LLC, provided to Iomnis. Mahony testified that the services entailed assessing whether Iomnis "was a good candidate to take to the market" for sale. He determined that, because of its debt, Iomnis was not a good candidate for sale. Mahony determined that the Iomnis's sale price would likely not cover the outstanding loan it owed to its members. Mahony provided feedback regarding how Iomnis could improve and modify its operations to make

the company more saleable. In June 2015, Iomnis hired Mahony as its chief operating officer. At the time, Iomnis still owed Mahony and his company $170,000.

## C.    The Transaction

Because Iomnis needed funding, Iomnis's vice president, Ken Harrison, approached his friend, Perry Rickel, at church about investing in Iomnis. On June 3, 2015, Harrison sent Rickel an email about the investment. Harrison stated, "As we talked about at church[,] Iomnis is growing at a crazy pace[,] but we need cash to sustain short term operations." He told Rickel that it was "a great time to steal some equity [in Iomnis] that is worth drastically less right now than it will be in a year." He represented that Iomnis had pending contracts for orders that it could not fulfill because it needed funding to execute on the contracts. Harrison told Rickel that "our growth is massive but needs short term funding in order to produce such a huge upswing in orders."

The next day, Rickel responded, asking about Iomnis's ownership structure. Harrison replied, listing Iomnis's owners. Harrison also told Rickel that he "just bought 2.7% of the company." He stated that his and Dynarock's purchase of membership units were based on valuing Iomnis at $17.5 million.

In addition to Harrison, Rickel communicated with Davis and Mahony about purchasing membership units in Iomnis. At trial, Rickel testified that Harrison, Davis, and Mahony told him that his investment would be used to enable Iomnis to

7

meet its current contractual obligations, which in turn would lead to Iomnis's growth. Specifically, Harrison, Davis, and Mahony told Rickel that the funds would be used for three purposes: (1) completing the "development of [Iomnis's] software so that [it] could execute on the contracts that [it] had in hand"; (2) purchasing business software to aid in running the company; and (3) hiring a "competent controller." In an email to Rickel on which Davis was copied, Mahony told Rickel that "[t]wo of their top immediate priorities with investment money [were] to hire a controller and purchase . . . business enterprise software to bring all our systems together." Rickel agreed that using the investment funds in the manner represented to him would help Iomnis grow and earn revenue.

In contrast to the representations made to Rickel, Davis sent an email to George, the chairman of Iomnis's Board of Managers, indicating "some of the places [he] would like to use the Perry [Rickel] investment money." While the list mentioned spending $25,000 for software, Davis earmarked a majority of the investment funds to pay Iomnis's debts, including the debt to Dell and the company's owners. This included paying (1) $500,000 to Dell, (2) $50,000 to Foulard, (3) $10,000 to Georgia, (4) $30,000 to Harrison, and (5) $40,000 to Mahony. He also suggested that $20,000 of the investment funds be used to pay Iomnis's credit card debt, stating, "I can't really afford to keep paying this."

So that Rickel could evaluate the investment, Davis and Mahony provided him with confidential information and materials regarding Iomnis's business operations and financial status. Before receiving the information, Rickel signed a non-disclosure agreement in which he agreed not to disclose Iomnis's confidential information. After Rickel signed the agreement, Mahony provided Rickel with Iomnis's 2013 and 2014 year-end financial statements, which showed that that Iomnis had lost nearly $3.2 million in 2013 and nearly $3.9 million in 2014. The 2014 statement showed that, on December 31, 2014, Iomnis owed $1,171,900.50 for hardware that it had purchased.

Rickel testified that the financial statements did not dissuade him from investing in Iomnis because the amount of money that Iomnis owed for hardware was consistent with the representations made to him by Iomnis's representatives indicating that Iomnis had "pour[ed] money" into the business "just to keep up with [its] growth." Rickel stated that, based on the representations, he believed that the negative values reflected in the 2014 financial statement would "lead to future profitability." He stated that he viewed the financial statement as a "snapshot in time." Rickel believed that, by the time he would make the investment, the negative balance would be "cleared up."

While the 2014 financial statement reflected a negative balance for "hardware," the statements did not reveal that the debt was owed to Dell, Iomnis's

9

primary hardware supplier, and Rickel was also not informed that Iomnis was delinquent on the debt. Nor was he informed that, on July 28, 2015, a Dell representative emailed Davis informing him that $1,315,172.87 was "past due" and asking Davis to provide payment status by the end of business that day.

Rickel testified that he was not informed that the loans from Iomnis's members were past due or that Mahony was owed $170,000 for his consulting services. Rickel testified that knowing that Iomnis could not pay Mahony would have been important to his investment decision because if they "[c]an't pay their consultant, what can they pay?" Rickel was also not informed that, as reported by Davis in Iomnis's June quarterly report, "during the first six months of 2015, Iomnis operated for 90 days without the ability to buy or sell hardware products" due to the freeze on the Dell account. When asked why knowing that information would have been important to his investment decision, Rickel responded, "Can't buy a product, you can't sell product. You can't buy inventory, you can't sell inventory."

Mahony also prepared and provided Rickel with Iomnis's 2015 profit and loss projections based on information obtained from Davis and others. This included projections about four projects for which Iomnis either had a contract or expected to receive a contract. The projections indicated that the projects would bring in revenue for Iomnis in the near future. For instance, it was represented to Rickel that one project—the Mexico City Project—would begin in September 2015 and generate

10

$3.6 million. But, when it was realized that that the project would be delayed and the start date uncertain, Davis conveyed that information to the Board members, but neither he nor Mahony updated Rickel to inform him of the delay and uncertainty. In addition, the projection provided to Rickel in June 2015 reflected that Iomnis's total 2015 revenue would be nearly $30 million, but only three months earlier—in March 2015—it had been projected that Iomnis's 2015 revenue would be $52.5 million. That change had not been disclosed to Rickel. He testified that knowing the change in the projection would have been important to his investment decision because it would have indicated that Iomnis did not know how to make revenue projections.

Rickel decided to invest in Iomnis. On July 28, 2015, Davis sent emails to the other four Board members regarding the vote to approve the sale of the new ownership units to Rickel. In an email sent at 12:15 p.m., Davis said, "We have all voted to move forward with Perry." Davis said that he thought it was "important to note we moved together on this as a company." However, 25 minutes later at 12:40 p.m., Davis sent an email to the Board stating, "Votes so far." He then listed each Board member's name. To the right of his name and the names of Georgia, Beard, and Dynarock, Davis wrote, "yes to the sale," indicating that those members had voted to approve the sale of the membership units to Rickel. But, next to Foulard's name, Davis left a blank space indicating that Foulard had not voted.

11

The parties dispute whether Foulard voted to approve the sale of membership units to Rickel. Davis testified that Foulard voted to approve the sale, but Foulard denied voting. Foulard testified that he had contacted George to ask for guidance about the vote but did not receive it. Foulard explained, "[S]ince I had never met Mr. Rickel and I didn't have a clue of . . . what was presented to him, I had to defer to my son's guidance." Foulard said that he had asked George, "How would you like me to vote?" Regarding George's response, Foulard pointed to an email that he had sent to George after the vote. In the email, Foulard stated that, in response to his request for guidance on the vote, he had been "rebuked with insults like I have never witnessed" and indicated that George had threatened to dismiss him from the Board. Foulard testified, "I did not actually vote. I only solicited guidance, but I never then voted." Although he testified that Foulard voted to approve the sale, Davis acknowledged in his testimony that the sale had enough votes to pass without Foulard's vote.

In early August 2015, Rickel formed MSR Holdings for the purpose of purchasing the membership units in Iomnis. MSR Holdings and Iomnis closed on the purchase on August 3, 2015, with the parties executing a Membership Interest Purchase Agreement (Purchase Agreement). Pursuant to the Purchase Agreement, MSR Holdings purchased 52.63 Common Membership Units in Iomnis, constituting a five percent ownership interest.

In the Purchase Agreement, Iomnis "warrant[ed] that it [was] not insolvent on any basis." Iomnis also warranted that there were "no facts that [Iomnis] kn[ew] or should [have known] about [itself] which could reasonably be expected to materially impair the value of the Purchased Units or materially affect the information provided to [MSR Holdings] . . . listed in article 3.2." The information listed in article 3.2 included Iomnis's 2013 and 2014 financial statements and its 2015 profit and loss projections. Article 3.2 also provided that MSR Holdings had "some knowledge of [Iomnis]" through Ken Harrison and "ha[d] met with Alan Davis, Ken Harrison, and John Mahony, specifically about [MSR Holdings] purchasing membership interests." MSR Holdings also "acknowledge[d] and agree[d] that [it was] aware investments of this nature involve risk and that there are no guarantees of profitability." Iomnis acknowledged MSR Holdings had "a justified expectation that the factual and historical data contained in all materials and information provided [was] true and correct and that [Iomnis] ha[d] a good faith belief that the forward-looking data [was] reasonable and achievable within the time frames presented."

The same day that the parties signed the Purchase Agreement, MSR Holdings wired Iomnis $875,000 as payment for the membership units. The next day, unbeknownst to Rickel, Iomnis paid Dell about $700,000 toward its delinquent debt. And, as loan repayment, Iomnis paid $25,000 to Georgia and $20,000 to Foulard.

13

Iomnis paid $20,000 to Davis for expenses and reimbursed him $10,000 for the "cost of goods" that he was carrying.

The $700,000 that Iomnis paid to Dell did not completely satisfy the past-due debt. Iomnis still owed Dell more than $600,000. A Dell representative emailed Davis notifying him that, if the representative did not hear from Iomnis within five business days, Iomnis's account would be turned over to a collection agency.

## D.    The Agreement to Indemnify

Iomnis sought to replace Dell as its hardware supplier by establishing a relationship with another vendor, NEC Corporation, and sought a line of credit with the company. To obtain a line of credit, NEC required another party to guaranty Iomnis's payments. Rickel offered MSR Holdings as the guarantor. Rickel prepared a Memorandum of Understanding (MOU) providing that "MSR [Holdings] or its Members . . . agreed to sign personally for the extension of a line of credit facility to Iomnis from NEC." Iomnis agreed that, in return for the guarantee, it would pay MSR Holdings "a fee equal to 3% of the amount borrowed" every time Iomnis accessed the line or credit and it agreed to repay Iomnis. MSR Holdings's obligation under the MOU would "terminate automatically and Iomnis and its members [would be required to] indemnify MSR Holdings" if Iomnis failed to pay the three percent fee when it accessed the credit line or if it failed to repay the line of credit. Rickel signed the MOU on behalf of MSR Holdings, and Davis signed as

14

"Member/Manager" of Iomnis, but Iomnis's other members did not sign the MOU. Rickel testified that Davis told him that the MOU was offered to all of Iomnis's board members and that "[e]verybody had accepted" it. Rickel stated that he believed Davis had the authority to sign the MOU on behalf of the Board members.

Foulard testified that he did not approve the terms of the MOU and did not agree to personally indemnify MSR Holdings. Davis testified that he did not remember whether he spoke to Foulard about the MOU. Davis stated that he had obtained the Board's approval to sign the MOU, but he did not remember if he had spoken with the Board members individually to determine if each approved the MOU's terms. Davis testified that he "would have at the very least spoken with at least two of the board members to get [the MOU] approved," but he did not state which two members.

Because MSR Holdings's only asset was its ownership interest in Iomnis, NEC rejected MSR Holdings as a guarantor of Iomnis's credit line. Rickel agreed that another company in which he had an ownership interest, Marrick, would guarantee the line of credit. After NEC accepted Marrick as guarantor, Marrick signed a guaranty agreement with NEC, guaranteeing Iomnis's payment. Despite the change in guarantor, no written agreement was prepared requiring Iomnis and its members to indemnify Marrick in the event that Iomnis defaulted on the line of credit. Nor was there a written modification to the MOU adding Marrick to the

15

agreement or indicating that Marrick was replacing MSR Holdings as guarantor and the party that Iomnis agreed to indemnify.

Iomnis used the NEC line of credit but then defaulted. NEC sued Marrick as Iomnis's guarantor, and Marrick paid $140,000 to settle the suit.

## E.    The Instant Lawsuit

MSR Holdings and Marrick sued Iomnis, its members, and its managers. MSR Holdings also sued Mahony and The Mahony Group. Before trial, MSR Holdings and Marrick settled their claims against Harrison, Georgia, George, and Dynarock, and those defendants were dismissed from the suit. Iomnis, Foulard, Beard, Davis, Mahony, and The Mahony Group remained as defendants.

The case was tried to the bench.[3] Marrick pursued a breach of contract claim against Iomnis and its members Davis, Foulard, and Beard, asserting they were contractually obligated under the MOU to indemnify Marrick for the $140,000 paid to settle the suit with NEC. Marrick acknowledged that it was not a signatory to the MOU but asserted that it was entitled to enforce the MOU as a third-party beneficiary. Marrick also asserted that the MOU had been orally modified by Davis and Rickel to require Iomnis and its members to indemnify Marrick. The parties

---

[3]    No counsel appeared on behalf of Iomnis, and Beard appeared pro se. Mahony, The Mahony Group, and Davis were represented by counsel, and Foulard was represented by separate counsel.

16

disputed whether the statute of frauds barred Marrick from recovering on an oral promise to indemnify it. Marrick argued that the statute of frauds did not apply because it had performed under the oral agreement by guaranteeing Iomnis's payment to NEC and that Iomnis and its members had accepted the benefits of its performance. Foulard and Beard also argued that the MOU was not enforceable against them individually because they had not signed the MOU and had not authorized Davis to sign for them.

MSR Holdings pursued violations of the Texas Securities Act (TSA)[4] against Iomnis, Davis, Mahony, The Mahony Group, Foulard, and Beard. MSR Holdings asserted that Iomnis, Davis, and Mahony had primary "seller" liability under the TSA because they had misrepresented and omitted material facts about Iomnis to MSR Holdings, through Rickel, in conjunction with the sale of the Iomnis membership units. *See* TEX. REV. CIV. STAT. art. 581–33A(2). MSR Holdings also alleged that Foulard, Beard, Davis, and Mahony had secondary "control person" and "aider" liability for those misrepresentations and omissions. *See id.* art. 581-33(F).

---

[4]   In 2019, the Legislature repealed the Texas Securities Act and, without making substantive changes to the Act, transferred its provisions to the Texas Government Code effective January 1, 2022. *See* Act of May 21, 2019, 86th Leg., R.S., ch. 491 (H.B. 4171), §§ 3.01, 4.01–.02, 2019 Tex. Gen. Laws 1238, 1316 (codified at TEX. GOV'T CODE §§ 4001.001–4008.105). Because it was in effect when MSR Holdings filed suit, we will cite the former version of the statute.

## F. Trial Court's Judgment

The trial court rendered judgment against Iomnis, Davis, Mahony, The Mahony Group, [5] and Foulard for violating the TSA. The trial court signed findings of fact and conclusions of law in which it concluded that Iomnis, Davis, and Mahony had primary-seller liability under the TSA and that Davis, Mahony, and Foulard had secondary control-person and aider liability. The trial court found that MSR Holdings "was entitled to [the] statutory right [of] rescission and the return of the $875,000 it paid for the Iomnis securities." *See id.* art. 581-33(A)(2) (providing that buyer "may sue either at law or in equity for rescission"). After applying "all allocable settlement credits," the trial court rendered judgment that Iomnis, Davis, Mahony, and Foulard were jointly and severally liable to MSR Holdings for $727,209.49, plus $453,274.50 in attorney's fees.

In addition, the trial court concluded that Foulard, Davis, and Beard were liable to Marrick for breach of contract, finding that they had "breached the terms of the agreement they made to obtain the Marrick Guaranty." The court found that they had "agreed to be severally liable to Marrick for the percentage of the $140,000 paid by Marrick corresponding to their respective voting percentage in Iomnis." It also determined that Marrick was "an intended creditor beneficiary of the

---

[5]     Because Mahony and The Mahony Group did not raise separate defensive arguments in the trial court—nor do they raise separate issues or arguments on appeal—we, at times, refer to them together as Mahony.

MOU . . . entitled to enforce the indemnification obligations of Iomnis and [its] Members." The trial court awarded Marrick $116,353.52 in actual damages and $45,479 in attorney's fees against Iomnis. It determined that Foulard, Davis, and Beard were severally liable to Marrick for a percentage of the $116,353.52 in actual damages and $45,479 in attorney's fees corresponding to his respective voting percentage in Iomnis. As a result, Foulard was ordered to pay $21,327.60 in actual damages and $8,336.30 in attorney's fees to Marrick, Davis was ordered to pay $18,453.67 in actual damages and $7,212.97 in attorney's fees, and Beard was ordered to pay $17,429.76 in actual damages and $6,812.75 in attorney's fees.

Davis, Mahony, and Foulard appealed the trial court's judgment. Iomnis and Beard did not appeal.

**Texas Securities Act Claims**

In what we construe as their first issue, Davis and Mahony challenge the legal and factual sufficiency of the evidence supporting the trial court's primary and secondary liability findings against them under the TSA. In his first issue, Foulard contends that the evidence was legally and factually insufficient to support the trial court's finding of secondary control person liability against him. He also challenges the finding of aider liability on the basis that MSR Holdings abandoned that claim, or, alternatively, on the ground that the evidence was legally and factually insufficient to support it.

## A.     Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence supporting them. *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). We review the trial court's findings of fact under the same sufficiency standard used to determine whether sufficient evidence exists to support a jury finding. *See Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 269–70.

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's finding and indulge every reasonable inference to support it. *Id.* at 822. Because it acts as the fact finder in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*,

20

116 S.W.3d 757, 761 (Tex. 2003). If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

In a factual sufficiency review, we consider and weigh all the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*

A party may not challenge the trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In an appeal from a bench trial, we review a trial court's conclusions of law de novo, affirming the judgment on any legal theory that finds support in the evidence. *See id.*

## B.    TSA Liability

The TSA establishes both primary and secondary liability for securities violations arising under Article 581–33, which is entitled "Civil Liability with Respect to Issuance or Sale of a Security." *See* TEX. REV. CIV. STAT. art. 581–33; *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 732 (Tex. App.—

Houston [1st Dist.] 2012, no pet.). Primary liability arises when a person offers or sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." TEX. REV. CIV. STAT. art. 581-33(A)(2). Secondary liability is derivative liability for another person's securities violation. *See Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 839 (Tex. 2005). It attaches either to a control person—defined as "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security"—or to an aider—defined as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* (quoting TEX. REV. CIV. STAT. art. 581-33(F)). Control persons and aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.* (quoting TEX. REV. CIV. STAT. art. 581–33F(1)–(2)).

## C. Davis and Mahony

The trial court concluded that Iomnis, Davis, and Mahony "committed primary violations of the TSA." In support of that conclusion, the trial court found:

- On behalf of Iomnis, Davis, Mahoney [sic], and [The] Mahony Group each actively and directly solicited the sale of Iomnis's securities to MSR, and each was motivated at least in part by a desire to serve his own financial interests or those of Iomnis.

22

- In connection with the sale of Iomnis's securities to MSR, Davis, Mahony, [The] Mahony Group, and Iomnis directly made untrue statements of material fact and omitted to state other material facts necessary to make the representations and warranties made in connection with the sale of Iomnis's securities to MSR not misleading.

### 1.  TSA "Sellers"

Davis and Mahony argue that the evidence did not support the determination of primary liability against them because it failed to show that they qualified as "sellers" under the TSA. They contend that, because they lacked contractual privity with the buyer, MSR Holdings, they could not be sellers.

In the Purchase Agreement, Iomnis agreed to pass title to the membership units to MSR Holdings for $875,000. Davis and Mahony correctly point out that Iomnis—named as "Seller" in the agreement—and MSR Holdings—named as "Buyer"—were the only parties to the agreement. Davis and Mahony were not parties to the agreement and did not pass title to the securities. However, for primary liability to attach, the question is not whether Davis and Mahony were sellers under the Purchase Agreement; it is whether they were sellers under the TSA.

Section 33A(2) imposes liability on a "person who offers or sells a security." *See* TEX. REV. CIV. STAT. art. 581–33(A)(2). The TSA does not limit the term "person" to the company transferring title to the security:

> The terms "person" and "company" shall include a corporation, person, joint stock company, partnership, limited partnership, association, company, firm, syndicate, trust, incorporated or unincorporated,

23

heretofore or hereafter formed under the laws of this or any other state, country, sovereignty or political subdivision thereof, and shall include a government, or a political subdivision or agency thereof.

*Id.* art. 581-4B. Nor does the TSA limit "sell" or "offers" only to the act of entering into a contract for the sale of securities:

> The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value. The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise. . . . The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent. . . . Nothing herein shall limit or diminish the full meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity.

*Id.* art. 581-4E.

In *Highland Capital*, we determined that brokers—who had "served as intermediaries" between the buyers and "the seller for each [security] purchase"— qualified as TSA sellers even though they had not passed title to the securities. 402 S.W.3d at 740–42. In analyzing the same version of the TSA as applies here, we noted that the TSA did not specifically define the term "seller." *Id.* at 740. Nor could we find Texas case law holding who may be a seller for purposes of Section 33A(2) primary liability. *Id.*

We noted that, in *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 383 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), the court determined that, "to impose

seller liability under Section 33A(2), a plaintiff must be in privity with defendant; that is, the plaintiff must have bought the securities from the defendant." *See id.* at 740–41. But we observed that the *Frank* court had "not define[d] the nature of the privity required or otherwise define[d] who qualifie[d] as a seller for Section 33A purposes." *Id.* at 741.

The Texas Legislature intended the TSA "to be interpreted in harmony with federal securities law." *Sterling Trust*, 168 S.W.3d at 840; *see* TEX. REV. CIV. STAT. art. 581-10-1A (providing that TSA "may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration"). For this reason, "Texas courts generally cite decisions of the federal courts to interpret the TSA." *Highland Capital*, 402 S.W.3d at 741. In *Highland Capital*, we relied on the United States Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622 (1988) to support our conclusion that brokers could be held liable for primary-seller liability under the TSA. *See Highland Capital*, 402 S.W.3d at 741.

In *Pinter*, the Supreme Court determined who could qualify as a seller under Section 12 of the federal Securities Act of 1933.[6] *See* 486 U.S. at 641–42. Section

---

[6]   "*Pinter* involved a claim under Section 12(1) (now Section 12(a)(1)), but that analysis applies identically to Section 12(a)(2)." *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 741 n.14 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 n.10 (5th Cir. 2003)).

12(a)(2), the federal analogue of TSA Section 33A(2), imposes liability on "any person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). The *Pinter* court held that, even though Section 12 suggests a "buyer-seller relationship not unlike traditional contractual privity," a defendant need not be the person who actually "transfer[ed] title to, or any other interest in, that property" to the purchaser to be liable as a statutory "seller." *See* 486 U.S. at 642–43. The Supreme Court examined the definition of "sale" and "sell," which includes "'every contract of sale or disposition of a security or interest in a security for value,'" and of the language "'offer to sell,'" "'offer for sale'" or "'offer,'" which encompasses "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.'" *Id.* at 643 (quoting 15 U.S.C. § 77b(3)). The Court explained that, under those definitions, "the range of persons potentially liable" under Section 12 was "not limited to persons who pass title." It reasoned that the "inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12." *Id.* And it explained that the statutory terms "offer" and "sell" were "'expansive enough to encompass the entire selling process.'" *Id.* (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)).

26

The *Pinter* court held that a Section 12 "seller" includes either the person who actually passes title to the buyer, or "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647. The Supreme Court explained the reasoning underlying its ruling:

> An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities. . . . The solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale. In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors. Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.

*Id.* at 646–47.

"Drawing from analogous federal precedent and the definitions of 'offer for sale' and 'sell' provided in the TSA," we recognized in *Highland Capital* "that a 'seller' for Section 33A(2) purposes can include '[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' such as a broker." 402 S.W.3d at 742 (quoting *Pinter*, 486 U.S. at 646–47). Here, the trial court found that Davis and Mahony "actively and directly solicited the sale of Iomnis's securities to MSR Holdings" and

that each were "motivated at least in part by a desire to serve his own financial interests or those of Iomnis." *See id.* Davis and Mahony assert that the evidence did not show that they "actively reached out to solicit" MSR Holdings. They point out that Harrison, not them, initially contacted MSR Holdings about investing in Iomnis. They assert that "Harrison [was] the one who first met with Mr. Rickel, discussed [the] business operations of Iomnis, wrote Mr. Rickel an email regarding investing into Iomnis, and then contacted other members of Iomnis to meet with Mr. Rickel." However, Davis and Mahony cite no authority for their contention that only the person who initially solicits the buyer can qualify as a Section 33A(2) seller.

Because our research finds no authority defining what constitutes a solicitation for purposes of Section 33A(2) liability, we turn to federal caselaw interpreting Section 12(a)(2). The Fifth Circuit Court of Appeals determined that, "[t]o count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (citing *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) ("The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12[(a)](2) seller.")). The Eleventh Circuit Court of Appeals explained that, to qualify as solicitation under Section 12, a person must "'urge' or 'persuade'" another to buy a particular security. *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1531 (11th Cir. 1991). But

28

seller liability does not extend to persons whose participation is "collateral to the offer or sale." *See Pinter*, 486 U.S. at 650.

Here, the evidence showed that Davis's and Mahony's participation in the solicitation of MSR Holdings's investment in Iomnis was not collateral to the sale. Instead, the evidence showed that Davis and Mahony communicated directly with MSR Holdings—through Rickel—in person and by email about investing in Iomnis. Davis and Mahony provided Rickel with information about Iomnis's financial status and business vitality so that Rickel could make an informed decision about the risk of investing in Iomnis. The evidence suggested that Davis and Mahony provided the information to Rickel in a manner designed to persuade him to invest in Iomnis. For instance, they told Rickel that the investment funds would be used to aid in Iomnis's future growth and to fulfil new contracts while failing to disclose the true plan for the investment funds—paying off Iomnis's delinquent debts. Thus, the evidence supported a reasonable inference by the trial court that Davis and Mahony "actively and directly solicited the sale of Iomnis's securities to MSR Holdings," and no evidence refuted that inference.

Davis and Mahony also assert that the evidence did not support the trial court's finding that they each were "motivated at least in part by a desire to serve his own financial interests or those of Iomnis." At a minimum, the evidence showed that they were motivated by Iomnis's financial interest. Each was aware of Iomnis's

29

bleak financial situation, including its inability to pay its creditors, employees, and consultants. The evidence also supported the finding that Davis and Mahony were each motivated by his own financial interest to solicit the sale. Iomnis owed Mahony $170,000 in consulting fees, and it owed Davis money for expenses that he had covered for the company. Without the sale, Iomnis could not pay Davis and Mahony the money that it owed to them. Not long after the sale, Davis was paid $30,000.

We conclude that the evidence supported the trial court's findings that Davis and Mahony successfully solicited MSR Holdings's purchase of Iomnis's membership units, motivated at least in part by a desire to serve their own financial interests or those of Iomnis. *See Highland Capital*, 402 S.W.3d at 742. Therefore, Davis and Mahony qualified as "sellers" under the TSA. *See id.*; *see also O'Donnell v. Roo Inv. Fund II, LLC*, No. 05-23-00238-CV, 2024 WL 469558, at *6 (Tex. App.—Dallas Feb. 7, 2024, no pet.) (mem. op.) (holding that evidence in summary-judgment proceeding conclusively established that managing member of limited liability company qualified as Section 33A(2) seller even though he was acting on behalf of LLC in soliciting sale of securities and he did not pass title to securities).

### 2. *Untrue Statements or Omissions of Material Fact*

To recover under the TSA, a securities buyer must prove that the security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading.

30

*See* TEX. REV. CIV. STAT. art. 581-33A(2); *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). On appeal, Davis and Mahony challenge the trial court's finding that they "made untrue statements of material fact and omitted to state other material facts necessary to make the representations and warranties made in connection with the sale of Iomnis's securities to MSR not misleading."

"For purposes of the TSA, an omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest." *Highland Capital*, 402 S.W.3d at 743. This is a mixed question of law and fact that is usually reserved for the trier of fact to resolve. *Id.* at 744. It can only be taken out of the hands of the trier of fact to resolve when "'the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.'" *Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir 1992)).

Rickel testified that Davis and Mahony represented that investment funds would be used to enable Iomnis to execute its customer contracts, thereby generating revenue and supporting Iomnis's growth. Davis and Mahony provided Rickel with Iomnis's 2015 profit and loss projections, which included information about four separate projects for which Iomnis either had a contract or expected to receive a contract. The information provided to Rickel indicated that the projects would bring

in revenue for Iomnis in the near future. For instance, it was represented to Rickel that one project—the Mexico City Project—would begin in September 2015 and generate $3.6 million in revenue. But, only four days later, Davis and Mahony realized that the start date would be delayed, and Davis informed the Board that the start date for that project was uncertain. Despite the change, neither he nor Mahony informed Rickel of the change, and Rickel continued to believe that the Mexico City Project would begin in September. The evidence showed that this was not the first time that the start date had been delayed. In March 2015, Davis and Mahony had calculated the start date as April 2015 but they later moved that date back to September. Rickel was also not been informed about the earlier delay.

The projection provided to Rickel reflected that Iomnis's total 2015 revenue would be nearly $30 million, but only three months earlier—in March 2015—it had been projected that Iomnis's 2015 revenue would be $52.5 million. That change was not disclosed to Rickel. He testified that knowing the change in the projections would have been important to his investment decision because it would have indicated that Iomnis did not know how to make revenue projections.

Davis and Mahony also told Rickel that the funds would be used for three specific purposes: (1) completing the "development of [Iomnis's] software so that [it] could execute on the contracts that [it] had in hand"; (2) purchasing business software to aid in running the company; and (3) hiring a "competent controller." In

32

an email from Mahony to Rickel, on which Davis was copied, Mahony told Rickel that "[t]wo of their top immediate priorities with investment money [were] to hire a controller and purchase . . . business enterprise software to bring all our systems together." Rickel agreed that using the investment funds in the manner represented to him would help Iomnis to earn revenue and grow.

Despite these representations, Davis sent an email to George, the chairman of Iomnis's Board of Managers, indicating "some of the places [he] would like to use the Perry [Rickel] investment money." While he mentioned using $25,000 for software, Davis earmarked a majority of the investment funds to pay Iomnis's debts. This included paying (1) $500,000 to Dell, (2) $50,000 to Foulard, (3) $10,000 to Georgia, (4) $30,000 to Harrison, and (5) $40,000 to Mahony. He also suggested that $20,000 of the investment funds be used to pay Iomnis's credit card debt that he had been carrying.

Unbeknownst to Rickel, the day after MSR Holdings transferred the $875,000 investment funds, Iomnis paid Dell $700,000 toward satisfying the $1.3 million delinquent hardware debt. Iomnis paid $20,000 to Davis for expenses and $10,000 for the "cost of goods" that he carried on his credit card. As loan repayment, Iomnis paid $25,000 to Georgia and $20,000 to Foulard.

Rickel testified that he had not been informed that the investment would be used to pay back member loans. He said that knowing that information was

33

important because "[t]hat's not what the investment was all about." When asked at trial whether he "invest[ed] in Iomnis' ability to grow as opposed to Iomnis' ability to pay past debts," Rickel responded that his "investment was to help [Iomnis] get to the next stage of its growth so that it could capitalize on the projects that have been awarded to it" as had been represented to him. He testified that he "didn't know anything about past debts" and that Davis and Mahony did not inform him "that there were material problems at Iomnis with solvency." Rickel testified that "[t]hey told [him] the opposite," representing to him that "the company was not insolvent on any basis." Rickel was told that Iomnis's "problem" was that it could not keep pace with its massive growth due to a lack of available cash in the short term to execute its contracts. Davis and Mahony represented that MSR Holdings's investment would help remedy that problem by providing funds to fulfill the contracts that it had or expected to receive.

The evidence reflected that Davis and Mahony were aware of Iomnis's past-due debt, including the delinquent debt owed to Dell. Rickel stated that he was not informed, before the sale closed, that Iomnis owed Dell over $1.3 million and was delinquent on the account. He was also not informed that Iomnis had operated for 90 days in the first half of 2015 without a line of credit, rendering it unable to buy product during that time. Rickel testified that was important information to know in deciding whether to invest Iomnis. He explained, "Can't buy a product, you can't

34

sell product. You can't buy inventory, you can't sell inventory." The evidence also showed that, even after using $700,000 of the investment toward the Dell debt, over $600,000 of the debt remained. Despite the payment, Dell notified Davis that the account would be turned over to a collection agency.

Rickel also testified that Mahony did not inform him that Iomnis owed him approximately $170,000 in delinquent consulting fees. Rickel stated that would have been important information to know in making the investment decision. He remarked, "Can't pay their consultant, what can they pay?"

On appeal, Davis and Mahony assert that no primary violation occurred because MSR Holdings based its investment "entirely" on the "forward-looking" projections and statements about Iomnis's future revenue.[7] In response, MSR Holdings correctly points out that it did not claim that Davis and Mahony violated Section 33A(2) because they "furnished MSR with forward looking projections which simply proved to be wrong." Instead, MSR Holdings offered evidence of

---

[7] We disagree with Davis and Mahony's framing of their argument. "The focus of the TSA is on the conduct of the seller or issuer of securities, i.e., whether they made a material misrepresentation or omission, not on the conduct of the buyers." *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Thus, the determinative issue is not whether MSR Holdings based its investment on the revenue projections; rather, it is whether Davis and Mahony made a material misrepresentation or omission in offering or selling the Iomnis securities. "[A]n investor is not required to prove that he would have actually acted differently but for the omission or misrepresentation." *Id.*

Davis's and Mahony's material misrepresentations and omissions of fact apart from the revenue projections.

As discussed, Davis and Mahony told Rickel how they planned to use the investment funds, which other evidence showed not to be a true representation of those plans. Instead of planning to use the funds to fulfill contracts to support the company's growth, as represented to Rickel, the evidence showed that the actual plan was to use the majority of the investment funds to pay the delinquent Dell debt and to repay money owed to insiders such as Davis, Harrison, Foulard, and Georgia.

Davis and Mahony also did not disclose key information showing that, at the time MSR Holdings was solicited to purchase the securities, Iomnis was in financial distress. They failed to disclose that Iomnis was not paying its creditors, including its primary supplier of hardware (Dell), its consultants (Mahony), and its members who had loaned it money (Foulard and Georgia). They also failed to disclose that the failure to pay Dell had resulted in that account being placed on hold for 90 days, preventing Iomnis from purchasing servers during that period. Davis and Mahony represented that the company was solvent with its main problem being that it could not keep up with the demand for its product. They supported that representation by providing information about upcoming projects, such as the Mexico City Project. They failed to disclose information about the project, such as the uncertainty about

its start date, while disclosing that information to those inside Iomnis who would benefit from MSR Holdings's investment.

Davis and Mahony point out that they provided Rickel with Iomnis's financial statements, which reflected Iomnis's debt and financial condition. They suggest that Rickel should have been able to ascertain the amount of Iomnis's debt from the financial disclosure provided. However, the financial statements did not disclose key information about Iomnis's financial status. For instance, the 2014 financial statement showed that at the end of that year Iomnis owed $1,171,900.50 for "hardware," but it did not disclose that the debt was owed to Dell, Iomnis's primary hardware supplier. The financial statements also did not disclose that Iomnis was delinquent on the debt or that the account had been frozen for 90 days.

Moreover, "[a] purchaser of a security has no duty of due diligence to verify the veracity of a seller's claims." *Khoury v. Tomlinson*, 518 S.W.3d 568, 582 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1996, no writ)); *see In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) ("The Texas Securities Act does not require that the buyer prove his own due diligence."). The TSA "merely requires proof of a misrepresentation by the seller." *Summers*, 935 S.W.2d at 234. In short, it is not a defense to a TSA violation that the purchaser "might have discovered the truth by the exercise of ordinary care." *Id.*

We conclude that the evidence supported the trial court's finding that Davis and Mahony "made untrue statements of material fact and omitted to state other material facts necessary to make the representations and warranties made in connection with the sale of Iomnis's securities to MSR not misleading." We hold that the evidence was legally and factually sufficient to support the trial court's determination that Davis and Mahony violated TSA Section 33A(2)—the primary liability provision. *See* TEX. REV. CIV. STAT. art. 581–33A(2). We overrule what we construe as Davis and Mahony's first issue.

Because the judgment against Davis and Mahony in favor of MSR Holdings can be upheld on the basis of primary liability, we need not address Davis and Mahony's other issues, challenging the trial court's determinations that they violated the TSA's secondary control person and aider provisions. *See In re Est. of Ewers*, — S.W.3d —, 2024 WL 333334, at *27 (Tex. App.—Houston [1st Dist.] Jan. 30, 2024, no pet.) (op. on reh'g) (recognizing that, when "judgment rests on multiple theories of recovery," appellate court "need not address each cause of action if any one theory is valid"); *see also* TEX. R. APP. P. 47.1 (providing that appellate court "must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

**D.    Foulard**

The trial court ruled that Foulard was secondarily liable under the TSA's control person and aider provisions. On appeal, Foulard challenges the sufficiency of the evidence to support the trial court's findings underlying its conclusion that he was liable as a control person. Foulard also asserts that the finding of aider liability was improper because MSR Holdings abandoned that claim in the trial court. Alternatively, Foulard asserts that the evidence was legally and factually insufficient to support aider liability.

**1.    *Control Person Liability***

"A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A . . . jointly and severally with the seller, buyer, or issuer, and to the same extent as the seller, buyer, or issuer." *See* TEX. REV. CIV. STAT. art. 581-33(F)(1). The TSA does not define "control person," but we use the same general definitions of "control" used under federal securities law. *Barnes v. SWS Fin. Servs.*, 97 S.W.3d 759, 763 (Tex. App.—Dallas, 2003, no pet.); *see* TEX. REV. CIV. STAT. art. 581–33F cmt. "[C]ontrol means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Frank*, 11 S.W.3d at 384. "Federal courts construing control person liability have fashioned a two-prong test: [1] that the defendant exercised control

over the operations of the corporation in general, and [2] that the defendant had the power to control the specific transaction or activity upon which the primary violation is predicated." *Id.* (citing *Abbott v. Equity Group Inc.*, 2 F.3d 613, 620 (5th Cir. 1993) (emphasis omitted)). The injured investor is not required to show that the defendant participated in the alleged violation to establish control person liability.[8] *See Barnes*, 97 S.W.3d at 764 (applying two-prong *Frank* test to determine whether individual was control person under TSA). "The rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator . . . is not." TEX. REV. CIV. STAT. art. 581–33(F) cmt.; *see Summers*, 935 S.W.2d at 231.

In its initial findings of fact and conclusions of law, the trial court determined that Foulard "controlled Iomnis as the term 'control' is used in the Texas Securities

---

[8]  Foulard points out that, in *Texas Capital Securities Management, Inc. v. Sandefer*, the Texarkana Court of Appeals included participation as a required element to establish control-person liability. 80 S.W.3d 260, 268 (Tex. App.—Texarkana 2002, pet. struck). As support, the *Sandefer* court relied solely on the Fifth Circuit's opinion in *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990), which the Fifth Circuit later recognized did not accurately reflect the control-person test. *See Abbott v. Equity Group Inc.*, 2 F.3d 613, 620 n.18 (5th Cir. 1993); *see also Barnes*, 97 S.W.3d at 764 (declining to apply *Sandefer* test because Fifth Circuit clarified that *Dennis* does not accurately reflect test). Therefore, we join our sister courts in Houston, Dallas, and Austin in applying the *Frank* test. *See Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 559 S.W.3d 537, 558 & n.10 (Tex. App.—Austin 2011), *judgment withdrawn, appeal dismissed*, No. 03-09-00566-CV, 2014 WL 5801862, 81 (Tex. App.—Austin Nov. 5, 2014, no pet.) (memo. op.) (declining to apply *Sandefer* test and applying *Frank* test); *Barnes*, 97 S.W.3d at 764 (same).

Act" because he "was in a position to prevent the primary violation." The trial court later entered additional findings and conclusions in which it determined that Foulard controlled Iomnis because he "had the power to control the sale" and "generally exercised control over Iomnis." The trial court found Foulard "occupied a position of actual power and influence" and "induced or participated in the sale."[9]

The comment to Section 33F provides, "Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company." TEX. REV. CIV. STAT. art. 581–33(F) cmt. To prove Foulard's status as a control person, MSR Holdings relied heavily on Foulard's status as a Class A Member who owned approximately 19 percent of Iomnis and was one of three Class A Managers on Iomnis's Board of Managers. However, it is a well-established principle that "status alone does not automatically cause defendants to be deemed control persons under the statute."[10]

---

[9] As discussed in the preceding footnote, participation is not required to establish control person liability. *See Frank*, 11 S.W.3d at 384.

[10] MSR Holdings cites two cases—*Summers v. WellTech, Inc.*, 935 S.W.2d 228 (Tex. App.—Houston [1st Dist.] 1996, no writ) and *Busse v. Pac. Cattle Feeding Fund # 1, Ltd.*, 896 S.W.2d 807 (Tex. App.—Texarkana 1995, writ denied)—to support its contention that control may be determined by Foulard's status alone. We disagree that either case supports that contention. In *Summers*, the issue presented was whether the TSA "preclude[d] a control person's liability in the absence of pleadings alleging the controlled entity's liability," not whether the evidence was sufficient to show that the defendant was a control person. *See* 935 S.W.2d at 231. Resolving the issue presented, this Court held that the TSA "[did] not require a plaintiff to seek affirmative relief against the controlled entity before such relief may be sought from a control person." *Id.* In *Busse*, the Texarkana Court of Appeals

41

*Tex. Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 268 (Tex. App.—

Texarkana 2002, pet. struck) (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509

(5th Cir. 1990)). As recognized in Section 33F's comment, a defendant's status as a

control person depends "on the circumstances." *See* TEX. REV. CIV. STAT. art. 581–

33(F) cmt. Here, the evidence did not show that the circumstances supported a

finding that Foulard generally exercised control over Iomnis, that is, the evidence

did not show that he generally exercised "the power to direct or cause the direction

of [its] management or policies." *See Frank*, 11 S.W.3d at 384 (defining "control").

Although he had an ownership interest in Iomnis since its inception, Foulard

was never an officer or employee, and he was not involved in Iomnis's day-to-day

operations. Davis testified that, as Iomnis's president, he made the "everyday

decisions" for the company. Davis explained that, before Foulard and Georgia

divorced, he would go to Foulard for financial decisions, but, after the divorce, he

reported to a "supermajority [of the] Class A Members"—meaning two of the three

Class A Members. Davis testified that, for financial decisions, he "typically" first

---

held, "As Lavern Busse was both the majority shareholder and a director, he was a control person within the meaning of the statutes." 896 S.W.2d at 815. However, seven years later, the court clarified its holding in *Busse*: "Although in *Busse*[, 896 S.W.2d at 815], we found Busse, who was a majority shareholder and a director, to be a control person, we do not construe this case to mean evidence solely of status creates a prima facie showing of control person." *Sandefer*, 80 S.W.3d at 268 n.3.

went to George, the Chairman of the Board, but, at times, he went to all three Class A Members—Foulard, Georgia, and George.

Foulard testified that, since the divorce, he had not communicated with Georgia. While he had since reconciled with George, Foulard indicated that the communications he had with George through 2015 were acrimonious. Because of the discord, Foulard testified that, after George and Georgia became members, he "c[a]me to the conclusion . . . that it probably wouldn't be a great idea for me to continue my involvement with Iomnis, if possible, in light of the fact that there was a lot of acrimony," which caused him to lose sleep and impacted his ability to manage Gulfstream, his primary business.

Even before the divorce, the evidence showed that Foulard's involvement in Iomnis was limited. He testified that he attended a few board meetings, a convention, and one company presentation, but he had not been involved in the technical or planning side of the business. Foulard's business, Gulfstream, had provided office space for Iomnis but Iomnis moved out before 2015. Gulfstream's chief financial officer, Becky Clamp, had also provided accounting services for Iomnis, but, by January 2015, she had stopped providing those services.

MSR Holdings argues that Foulard had control because he was one of only three Class A Managers. And it points out that the evidence showed that Georgia and George did not have a formal voting agreement. But, even without a formal

43

agreement, the evidence showed that George and Georgia—who had acrimonious relationships with Foulard—always voted the same on matters brought to the Board, thereby constituting a supermajority voting interest that would control on matters affecting Iomnis's management.

MSR Holdings points out that the Company Agreement provides that the "Board of Managers shall exercise complete and exclusive control of the management of [Iomnis's] business and affairs and have the right, power, and authority on behalf of the Company, and in its name, to exercise all of the rights, power, and authorities of the Company." But the cited language speaks to the power of the Board in the aggregate and not to the power of individual members.

MSR Holdings also points out that, in his testimony, Foulard agreed that, as a Board member, Iomnis's officers reported to him in the chain of command. But the next question posed to Foulard was: "And as a manager you had the right—the Board collectively had the right to direct the officers on how to conduct their affairs, correct?" Foulard answered, "We had the right, that's correct." This was a recognition that the Board as a body controlled Iomnis and its officers, not the individual members of the Board.

The evidence also did not support a finding that Foulard had the power to control the specific transaction or activity upon which the primary violation is predicated. *See id.* It is undisputed that Rickel and Foulard did not communicate

before the sale of the membership units to MSR Holdings. Instead, to show control, MSR Holdings relied primarily on evidence that Foulard voted in favor of the sale.

At trial, Foulard testified that he never cast a vote either for or against the sale. The evidence showed that Davis sent in an email at 12:15 p.m. on July 28, 2015, to the other four Board members. In the email, Davis stated, "We have all voted to move forward with Perry." Davis stated that he thought it was "important to note we moved together on this as a company." However, 25 minutes later at 12:40 p.m., Davis sent another email to the Board stating, "Votes so far," listing each Board member's name. To the right of his name and the names of Georgia, Beard, and Dynarock, Davis wrote, "yes to the sale," indicating that those members had voted to approve the sale. But, next to Foulard's name, Davis left a blank space indicating that Foulard had not yet voted. When asked at trial about the vote, Davis testified that Foulard had voted to approve the sale.

On appeal, Foulard contends that the later-sent email from Davis to the Board necessarily proves that he never voted. We disagree. In a bench trial, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Zenner*, 371 S.W.3d at 314. In resolving factual disputes, the trial court may choose to believe one witness and disbelieve others. *Id.* Here, the trial court was permitted to believe Davis's testimony that Foulard voted to approve the sale. However, at trial, even Rickel acknowledged that, given the votes of the other

Board members—who possessed over 80 percent of the voting interests compared to Foulard's approximately 19 percent interest—the sale would move forward regardless of how or if Foulard voted.

MSR Holdings also points out that Foulard acknowledged that he had signed a waiver to allow the dilution of his membership interest. The record contains an email from Foulard stating that he was forwarding his signed waiver, but the signed waiver does not appear in the record. Moreover, the record does not show that all members were required to sign the waiver for the sale to occur.

When asked about Foulard's control, Rickel testified that Foulard had the power to control the sale because he could have influenced how Davis and Beard voted. But, beyond Rickel's speculation about Foulard's possible influence on Davis and Beard, MSR Holdings offered no evidence that Foulard had the power to control the sale by indirectly controlling Davis's and Beard's vote. Thus, Rickel's testimony provided no support for an inference that Foulard had the power to control the sale. *See Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) ("An inference is not reasonable . . . if it is premised on mere suspicion").

In addition, evidence was presented indicating that Foulard did not have influence over Davis's and Beard's votes or the power to control the sale of Iomnis's securities. Foulard testified that, in early 2015, Georgia's divorce attorney was allowed to purchase a one percent ownership interest in Iomnis. Foulard "loudly"

46

opposed the purchase. He testified that he was "disgusted" by the purchase because he had sued the divorce attorney for defamation. Foulard explained that he offered to buy the one percent interest and even pay more for it than the attorney. Despite his opposition and purchase offer, all the other members, including Davis and Beard, voted to sell the membership units to the divorce attorney. Foulard was outvoted, and Georgia's attorney became a member of Iomnis.

As noted, "[t]he rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator . . . is not." TEX. REV. CIV. STAT. art. 581–33(F) cmt. Here, the evidence did not show that Foulard was in a position to prevent the primary violation.

We conclude that the evidence does not enable reasonable and fair-minded people to find that Foulard exercised general control over Iomnis or that he had the power to control the sale. *See City of Keller*, 168 S.W.3d at 822. Thus, we hold that the evidence was legally insufficient to support control person liability against Foulard.

### 2. *Abandonment of Aider Claim*

In its findings of fact and conclusions of law, the trial court found that Foulard had "directly or indirectly, with either an intent to deceive or defraud *or* with a reckless disregard for the truth or the law, materially assisted Iomnis in committing

47

a primary securities law violation and thus [was], jointly and severally, liable, as [an] aider[], for secondary violations of the TSA." *See* TEX. REV. CIV. STAT. art. 581–33(F)(2). On appeal, Foulard asserts that the finding was improper because MSR Holdings had abandoned its aider claim against him.

"A party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried." TEX. R. CIV. P. 165. Whether a claim has been abandoned is a question of law which we review de novo. *In re C.C.J.*, 244 S.W.3d 911, 921 (Tex. App.—Dallas 2008, no pet.). Formal amendment of the pleadings is not required in order to show abandonment. *In re Shaw*, 966 S.W.2d 174, 177 (Tex. App.—El Paso 1998, no pet.). Instead, a stipulation may form the basis for abandonment. *Id.* "A stipulation is an agreement, admission, or [other] concession made in a judicial proceeding by the parties or their attorneys." *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 821 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (alteration in original). In construing a stipulation, we must determine the parties' intent from the language of the entire agreement and the surrounding circumstances, including the state of the pleadings, the allegations made therein, and the attitudes of the parties toward the issue. *Id.* at 822. "Where a stipulation limits the issues to be tried or considered by the [fact finder], those issues are excluded from consideration." *Id.*

During closing argument, MSR Holdings stated the claims that it was pursuing against each defendant under the TSA. After stating that it was pursuing claims for primary seller and secondary control-person and aider violations against Davis, Mahony, and Harrison, MSR Holdings asserted, "Then comes the question . . . as to the other two individual Defendants, Mr. Foulard and Mr. Shelby Beard, we believe that they are liable as controlling persons under the statute." MSR Holdings then discussed the law regarding control person liability and argued why Foulard and Beard should be held liable as control persons. In contrast to the other three individual defendants, MSR Holdings did not assert aider liability against Foulard and Beard.

In August 2021, one week after trial, MSR Holdings filed its proposed findings of fact and conclusions of law. The proposed findings and conclusions reflected that MSR Holdings sought findings that Davis and Mahony had violated the aider provision, but it sought no findings that Foulard had violated that provision. Against Foulard, MSR Holdings pursued only findings for control person liability.

Pending the determination of attorney's fees, the trial court signed an interlocutory judgment in December 2021. The interlocutory judgment reflected that Foulard had "committed a secondary violation of the TSA" but did not specify the violation. The interlocutory judgment separately specified that the trial court found "in favor of Plaintiff MSR Holdings LLC and against Defendants Alan Davis, John

49

Mahony, and The Mahony Group, LLC on [its] claims for aider and abettor liability." Foulard was not included in that finding.

In May 2022, the trial court signed its final judgment. Unlike the interlocutory judgment, the final judgment did not specify the bases for the defendants' liability. The following month, the trial court signed its findings of fact and conclusions of law reflecting the bases of liability supporting the judgment. Deviating from MSR Holdings's proposed findings and conclusions, the trial court found that Foulard had committed both control-person and aider violations. Foulard filed a request for additional and amended findings of fact and conclusions of law. He objected to the finding of aider liability on the ground that MSR Holdings had abandoned that claim. The trial court entered additional findings and conclusions but did not amend the original findings and conclusions to omit the aider liability finding against Foulard.

On appeal, Foulard argues that the trial court improperly made a finding of aider liability against him because MSR Holdings's closing argument, its proposed findings of fact and conclusions, and the interlocutory judgment support a conclusion that MSR Holdings abandoned the aider claim against him. In evaluating this argument, we find instructive *In re J.M.*, 352 S.W.3d 824 (Tex. App.—San Antonio 2011, no pet.). There, the Department of Family and Protective Services (DFPS) filed a petition seeking termination of the parental rights of Steve, Magdalena, and two other fathers. *Id.* at 825. During closing arguments of the bench

50

trial, DFPS's counsel stated, "I would ask that [Steve's] rights be terminated" to J.M., but "if [the] parental rights of [Magdalena] are not terminated, we ask [that Steve] can keep his parental rights [to J.M.] as well. He can be a possessory conservator." *Id.* After closing arguments, the trial court did not terminate Magdalena's parental rights or the rights of two of the other fathers, but it did terminate Steve's rights to J.M. Steve filed a motion for new trial. *Id.* At the new trial hearing, DFPS acknowledged that it "had only conditionally sought termination of Steve's parental rights." *Id.* at 826. The trial court denied the motion for new trial, and Steve appealed. *Id.*

On appeal, Steve argued the trial court erred in terminating his parental rights because DFPS abandoned its pleading seeking termination during its closing argument. *Id.* In opposition to the abandonment claim, DFPS argued that it "could not abandon its pleading during closing arguments because Texas Rule of Civil Procedure 162 requires a party to dismiss a claim or take a non-suit 'before the plaintiff has introduced all of his evidence.'" *Id.* at 827 n.3. The court rejected DFPS's argument because "Rule 162 applies only to dismissals and non-suits and is not relevant to our analysis of whether DFPS abandoned its pleading in this case."[11] *Id.*; *see* TEX. R. CIV. P. 162 ("At any time before the plaintiff has introduced all of

---

[11] Although not determinative of the issue, we note that MSR Holdings does not address Foulard's argument that it abandoned its aider claim and does not address Foulard's alternate issue that the evidence was insufficient to support aider liability.

51

his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit . . . ."). On appeal, the court of appeals reversed the judgment against Steve. *See In re J.M.*, 352 S.W.3d at 827. The court agreed that, under the circumstances, DFPS had abandoned its termination claim against Steve. *See id*. at 828.

Here, during its closing arguments, MSR Holdings specified which TSA claims it was pursuing against which defendants. MSR Holdings stated that it was pursuing claims for seller, control person, and aider liability against Davis, Mahony, and Harrison. It excluded Foulard from that statement. Instead, MSR Holdings made clear that it was separately addressing its claim against Foulard (and Beard). MSR Holdings limited the basis on which it sought judgment against Foulard to control person liability. Focusing expressly on control person liability, MSR Holdings discussed the law governing control person liability and argued only that Foulard was liable as a control person. One week later, MSR Holdings filed its proposed findings of fact and conclusions of law, reflecting the claims on which it pursued judgment. Consistent with its closing argument, MSR Holdings excluded Foulard from the proposed aider liability findings. MSR Holdings limited the findings it proposed to support its judgment against Foulard to findings of control person liability. Several months later, the interlocutory judgment—excluding Foulard from the aider liability finding—confirmed that MSR Holdings was no longer pursuing the aider claim against him.

In light of the record, we conclude that MSR Holdings abandoned its aider claim against Foulard and that the trial court erred in making a liability finding against him on that claim. *See id.*; *see also Rosenboom Mach. & Tool*, 995 S.W.2d at 822–23 (determining strict liability claim was abandoned when trial counsel advised trial court that only remaining issues were claims for gross negligence and damages). We hold that the abandoned aider claim cannot support the trial court's judgment against Foulard. *See In re J.M.*, 352 S.W.3d at 828.

### 3. *Evidence Did Not Support Aider Liability*[12]

Even if MSR Holdings did not abandon its aider claim against Foulard, the evidence did not support that claim.

To prove secondary aider liability, the plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred; (2) the alleged aider had "general awareness" of its role in this violation; (3) the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Highland Capital*, 402 S.W.3d at 733 (citing *Darocy v. Abildtrup*, 345 S.W.3d 129, 138–39 (Tex. App.—Dallas 2011, no pet.); *Frank*, 11 S.W.3d at 384).

As mentioned, MSR Holdings did not argue in the trial court, nor does it argue on appeal, that the evidence supported an aider liability finding. A review of the

---

[12] Foulard alternatively asserts that the evidence was legally and factually insufficient to support the aider claim.

record shows that Foulard played no role in providing information to MSR Holdings about Iomnis before the sale. The only evidence arguably showing "assistance" by Foulard in the commission of the primary violation was the conflicting evidence that he voted to approve the sale. But even assuming, without deciding, that a vote to approve a securities sale could constitute "assistance" of the primary violation, the evidence showed that Foulard's vote had no effect on whether the sale was approved, as discussed above. Thus, the assistance provided by Foulard was not shown to be "substantial assistance" as required to prove aider liability. *See id.*

We conclude that the evidence does not enable reasonable and fair-minded people to find that Foulard provided substantial assistance in committing the primary violation. *See City of Keller*, 168 S.W.3d at 822. Thus, we hold that the evidence was legally insufficient to support aider liability against Foulard.

To summarize, we have held that the evidence was legally insufficient to support control person liability against Foulard. We also hold that MSR Holdings abandoned its aider claim, and, even if it did not, the evidence was legally insufficient to support aider liability. Accordingly, we sustain Foulard's first issue.[13]

---

[13] Given the disposition of this issue, we need not reach Foulard's second issue asserting that he had a valid statutory defense to control person liability. *See* Tex. R. App. P. 47.1.

## Breach of Contract

In his third issue, Foulard contends that the trial court erred by rendering judgment against him based on Marrick's breach of contract claim. In what we construe as his second issue, Davis makes the same challenge regarding his breach-of-contract liability.

### A.     Relevant Background

As discussed, Rickel offered MSR Holdings as the guarantor on the line of credit that Iomnis obtained with NEC. Rickel prepared the MOU, which provided that "MSR [Holdings] or its Members ('Guarantors') agreed to sign personally for the extension of a line of credit facility to Iomnis from NEC." In return for the guarantee, Iomnis agreed that it would pay MSR Holdings "a fee equal to 3% of the amount borrowed" each time it accessed the credit line. The parties agreed that MSR Holdings's obligation would "terminate automatically and Iomnis and its members [would be required to] indemnify MSR Holdings" if Iomnis failed to pay the three percent fee or failed to repay the line of credit. Rickel signed the MOU on behalf of MSR Holdings. Davis signed the MOU as Iomnis's "Member/Manager."

After NEC rejected MSR Holdings as guarantor, Rickel offered Marrick to guarantee the line of credit. NEC accepted Marrick as guarantor, and Marrick signed an agreement with NEC, guaranteeing Iomnis's payment. Despite the change in guarantor, no written agreement between Iomnis and Marrick was signed indicating

that Marrick would be guarantor and requiring Iomnis and its members to indemnify Marrick if Iomnis defaulted on the line of credit. Nor was there a written modification to the MOU adding Marrick or indicating that Marrick was replacing MSR Holdings as the guarantor that Iomnis and its members agreed to indemnify.

Iomnis defaulted on the NEC credit line, prompting NEC to sue Marrick as Iomnis's guarantor. Marrick settled the suit with NEC for $140,000.

Marrick sued Iomnis and its members—Davis, Foulard, and Beard—for breach of contract, asserting that they were contractually obligated under the MOU to indemnify Marrick for the $140,000 that it paid to settle the NEC suit. Marrick acknowledged that it was not a signatory to the MOU but asserted that it was entitled to enforce the MOU as a third-party beneficiary. Marrick also asserted that the MOU had been orally modified by Davis and Rickel to require Iomnis and its members to indemnify Marrick. The parties disputed whether the statute of frauds barred Marrick from recovering on an oral promise to indemnify it. Marrick argued that the statute of frauds did not apply because it had performed under the oral agreement by guaranteeing Iomnis's payment to NEC and that Iomnis and its members had accepted the benefits of Marrick's performance. Foulard and Beard also argued that the MOU was not enforceable against them individually because they had not signed the MOU or authorized Davis to sign for them.

The trial court concluded that Foulard, Davis, and Beard had "breached the terms of the agreement they made to obtain the Marrick Guaranty," finding that they had "agreed to be severally liable to Marrick for the percentage of the $140,000 paid by Marrick corresponding to their respective voting percentage in Iomnis." The court also determined that Marrick was "an intended creditor beneficiary of the MOU . . . entitled to enforce the indemnification obligations of Iomnis and [its] Members."

## B.     Third-Party-Beneficiary Status

Foulard and Davis assert that the MOU did not confer third-party-beneficiary status on Marrick as found by the trial court. We agree.

Generally, "no person can sue upon a contract except he be a party to or in privity with it." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (quoting *House v. Hous. Waterworks Co.*, 31 S.W. 179, 179 (Tex. 1895)). An exception to this general rule permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary." *Id.* (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Corp.*, 995 S.W.2d 647, 651 (Tex. 1999)). Absent a contrary statutory or legal rule, third-party-beneficiary status is conferred solely through the contracting parties' intent. *Id.* (citing *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)).

When, as here, a contract is unambiguous, we ascertain the contracting parties' intent from the words of the contract, which we interpret as a matter of law.

*See id.* at 102, 105–07; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."). To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole. *See First Bank*, 519 S.W.3d at 102. We cannot consider extrinsic evidence to add to or alter the terms of an unambiguous contract, including when deciding whether it confers third-party beneficiary status to noncontracting parties. *See id.* at 109–10.

To confer third-party beneficiary status, a contract must show that the contracting parties intended to secure a benefit to the third party and entered the contract directly for the third party's benefit. *Id.* at 102; *see S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) ("A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit."). The contract must also show that the contracting parties intended to grant the third party the right to enforce the contract in the event of a breach. *First Bank*, 519 S.W.3d at 102.

We presume a contract does not confer third-party beneficiary status on noncontracting parties. *Id.* at 103 (citing *Corpus Christi Bank & Tr. v. Smith*, 525

58

S.W.2d 501, 503–04 (Tex. 1975)). To overcome this presumption, the contract must express an intent to make a noncontracting party a third-party beneficiary in clear and unequivocal language. *Id.* Because clear and unequivocal language is required, third-party beneficiary status cannot be implied. *Id.* at 103.

A noncontracting party suing for breach of contract as a third-party beneficiary bears the burden of demonstrating this status. *See id.* at 102. He cannot carry this burden based on "a mere description of the contract's intended use." *Jody James Farms v. Altman Grp.*, 547 S.W.3d 624, 635 (Tex. 2018). To qualify as a third-party beneficiary, he must benefit from the contract more than incidentally. *Lomas*, 223 S.W.3d at 306. He must be either a donee or creditor beneficiary. *Id.* A party is a donee beneficiary if the promised performance will, when rendered, come to him as pure donation. *Alvarado v. Lexington Ins. Co.*, 389 S.W.3d 544, 551 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *MCI Telecomms.*, 995 S.W.2d at 651). If that performance will come to him in satisfaction of a legal duty owed to him by the promisee, such as an "indebtedness, contractual obligation or other legally enforceable commitment," the party is a creditor beneficiary. *Id.* at 551–52 (quoting *MCI Telecomms.*, 995 S.W.2d at 651).

Given that Marrick—another company owned by Rickel—stepped in to replace MSR Holdings as guarantor, it could arguably be presumed that the parties intended for Marrick to replace MSR Holdings as the party that Iomnis would

indemnify in the event of default. But such a presumption cannot support Marrick's status as a third-party beneficiary, instead we presume the opposite—that the parties did not intend to make Marrick a third-party beneficiary. *See Corpus Christi*, 525 S.W.2d at 503–04 (holding that court presumes opposite—that parties intended not to confer third-party beneficiary status—and party seeking to overcome that presumption must point to contractual language that "clearly" expresses that intent). To determine whether Marrick overcame that presumption, we look to language of the MOU to ascertain the intent of the parties.

In its first paragraph, the MOU provided that "MSR [Holdings] or its Members ('Guarantors') agreed to sign personally for the extension of a line of credit facility to Iomnis from NEC." In return, Iomnis agreed in the MOU's second paragraph to pay MSR Holdings three percent of the amount it borrowed on the line of credit each time it accessed the credit line. Iomnis also agreed to repay the line of credit. In the third paragraph, the parties agreed that "Guarantors' obligations hereunder shall terminate automatically, and Iomnis and its members shall indemnify Guarantors, if the above steps (paragraph 2) are not followed." The MOU did not mention Marrick and contains no language indicating that Marrick, or any other party aside from MSR Holdings, was entitled to indemnity from Iomnis. The MOU provides that Iomnis must indemnify "Guarantors" in the event of a default, but it limits the meaning of "Guarantors" to MSR Holdings and its members.

60

Based on the MOU's plain and unambiguous language, we agree with Foulard and Davis that the MOU did not express an intent by the parties to make Marrick a third-party beneficiary of either type—donee or creditor. *See First Bank*, 519 S.W.3d at 102. We hold the trial court erred in finding that Marrick had third-party-beneficiary status.[14]

## C.    Statute of Frauds

Davis and Foulard assert that the affirmative defense of statute of frauds bars enforcement of any oral agreement between Iomnis and Marrick to either add Marrick as a party to the MOU or substitute Marrick for MSR Holdings. In its findings of fact and conclusions of law, the trial determined that no affirmative defenses had been proven. *See* TEX. R. CIV. P. 94 (listing statute of frauds as affirmative defense).

---

[14]    Rickel testified that Marrick was a party to the MOU "through its association with him." We agree with Foulard that we cannot consider Rickel's testimony because it violates the parol evidence rule, "which provides that, in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written contract that is facially complete and unambiguous." *Carrizo Oil & Gas, Inc. v. Barrow-Shaver Res. Co.*, 516 S.W.3d 89, 95 (Tex. App.—Tyler 2017), *aff'd on other grounds*, 590 S.W.3d 471 (Tex. 2019). But, even if we were to consider the testimony, the "association" between Rickel and Marrick did not confer party status on Marrick, a limited liability company. Rickel signed the MOU on behalf of MSR Holdings as its "Member/Manager," making MSR Holdings a party to the contract. The contract did not mention Rickel's "association" with Marrick. Moreover, Marrick is a limited liability company partly owned by Rickel. A limited liability company is a distinct and separate legal entity from its owner. *See Steer Wealth Mgmt., LLC v. Denson*, 537 S.W.3d 558, 567 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Thus, Marrick was not a party to the MOU based merely on Rickel's ownership of it.

The statute of frauds generally renders a contract that falls within its purview unenforceable. *See* TEX. BUS. & COM. CODE § 26.01(a). The statute of frauds' suretyship provision applies to "a promise by one person to answer for the debt, default, or miscarriage of another person." *Id.* § 26.01(b)(2). The party pleading the statute of frauds bears the initial burden of establishing its applicability. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641 (Tex. 2013) (citing TEX. R. CIV. P. 94). Once that party meets its initial burden, the burden shifts to the opposing party to establish an exception that would take the verbal contract out of the statute of frauds. *Id*. Whether a contract falls within the statute of frauds is a question of law, which we review de novo. *Id.*

According to Marrick, it orally agreed to guaranty Iomnis's line of credit with NEC. Marrick asserts that, in exchange for the guaranty, Iomnis and its members agreed to indemnify it if Iomnis defaulted. Because Marrick agreed to pay the debt of another—Iomnis—the agreement fell within the statute of frauds' suretyship provision and was required to be in writing to be enforceable. *See* TEX. BUS. & COM. CODE § 26.01(b)(2); *see also Lawrence v. Reyna Realty Grp.*, 434 S.W.3d 667, 673 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Generally, if a contract falls within the statute of frauds, then a party cannot enforce any subsequent oral material modification to the contract.").

A party seeking to avoid the statute of frauds must plead, prove, and secure findings as to an exception or risk waiver. *See Dynegy*, 422 S.W.3d at 641; *Wood v. Wiggins*, 650 S.W.3d 533, 553 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *see also Crown Ranch Dev., Ltd. v. Cromwell*, No. 09-10-00458-CV, 2012 WL 585087, at *5, (Tex. App.—Beaumont Feb. 23, 2012, pet. denied) (mem. op.) ("A party who contends that an agreement falls within an exception to the statute of frauds must request and obtain a jury finding on the exception."); *W.H. McCrory & Co. v. Contractors Equip. & Supply Co.*, 691 S.W.2d 717, 720 (Tex. App.—Austin 1985, writ ref'd n.r.e.) (placing burden on plaintiff to plead and prove exception to statute of frauds). Because Davis and Foulard proved that the statute of frauds applied, the burden shifted to Marrick to establish an exception that would take the verbal contract out of the statute of frauds. *See Dynegy*, 422 S.W.3d at 642.

On appeal, Marrick contends that two exceptions—the main purpose doctrine and partial performance—remove the oral agreement from the statute of frauds. *See Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 827 (Tex. 2012) (recognizing main purpose doctrine as exception to statute of frauds); *Wood*, 650 S.W.3d at 553 (discussing partial performance as exception to statute of frauds). A review of the record shows, however, that Marrick did not plead the main purpose doctrine, nor is there evidence that the exception was tried by consent. In addition, Marrick did not

obtain findings of fact from the trial court on either the main purpose doctrine or the partial performance exception.

Under the main purpose doctrine, a promise to pay the debt of another is not barred by the statute of frauds if the promisor assumed primary responsibility for the debt and his leading objective is to serve some interest or purpose of his own. *See Cruz*, 364 S.W.3d at 828. The Supreme Court of Texas has "noted that the question of intent to be primarily responsible for the debt is a question for the finder of fact, taking into account all the facts and circumstances of the case." *Dynegy*, 422 S.W.3d at 642 (*Haas Drilling Co. v. First Nat'l Bank*, 456 S.W.2d 886, 889 (Tex. 1970)). Similarly, whether the partial performance exception applies is a question of fact. *See Burrus v. Reyes*, 516 S.W.3d 170, 182 (Tex. App.—El Paso 2017, pet. denied); *see also Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 158 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The question of whether an exception to the statute of frauds applies is generally a question of fact."). Thus, the party asserting either exception has the burden to secure favorable findings on the exception. *See Dynegy*, 422 S.W.3d at 642; *Wood*, 650 S.W.3d at 553.

Because the main purpose doctrine was not pleaded or tried by consent, and Marrick did not secure a finding of fact from the trial court regarding either the main purpose doctrine or the partial performance exception, we conclude that Marrick waived both exceptions. *See Dynegy*, 422 S.W.3d at 642; *Wood*, 650 S.W.3d at 554.

We hold that the statute of frauds renders any oral agreement between Marrick and Iomnis and its members unenforceable. Consequently, Marrick cannot recover under its breach of contract claim. *See Dynegy*, 422 S.W.3d at 643 (reversing judgment in favor of respondent on his breach of contract claim because statute of frauds rendered contract unenforceable, and respondent had waived main-purpose-doctrine exception to statute of frauds by failing to obtain fact finding on exception); *Wood*, 650 S.W.3d at 554 (holding that partial performance exception was waived where party failed to, inter alia, "secure a finding of fact or conclusion of law from the trial court as to the exception").

We sustain Foulard's third issue and Davis's second issue.

## Conclusion

We reverse the portions of the trial court's judgment ordering that Foulard is jointly and severally liable to MSR Holdings for (1) $727,209.49 based on statutory rescission, (2) $453,274.50 in attorney's fees, (3) pre- and post-judgment interest, and (4) taxable costs of court. We also reverse the portions of the judgment ordering Foulard to pay Marrick (1) $21,327.60 in damages, (2) $8,336.30 in attorney's fees, (3) pre- and post-judgment interest, and (4) taxable court costs. We render judgment that MSR Holdings and Marrick take nothing by their claims against Foulard. We also reverse the portion of the trial court's judgment ordering Davis to pay Marrick (1) damages of $18,453.67, (2) $7,212.97 in attorney's fees, (3) pre- and post-

judgment interest, and (4) taxable court costs. We render judgment that Marrick take nothing by its claims against Davis. We affirm the remaining portions of the trial court's judgment.

Richard Hightower
Justice

Panel consists of Justices Goodman, Landau, and Hightower.